First National Bank of Hempstead, N. Y., and Others, Appellants, Impleaded with Maxwell & Co., Inc., Plaintiff, *v.* Level Club, Inc., and Others, Respondents, Impleaded with Isidore Gainsburg and Others, Defendants.

First Department, June 8, 1934.

*R. Randolph Hicks* of counsel [*Lloyd F. Thanhouser* with him on the brief; *Satterlee & Canfield*, attorneys], for the appellants.

*I. Gainsburg* of counsel [*Philip J. Dunn* and *Ralph O. L. Fay* with him on the brief; *Philip J. Dunn*, attorney for Peter Schmuck; *I. Gainsburg*, attorney for Tel Mel Bernstein, Eugene Hatschek, Emanuel Kalisch, Max E. Meyers and Louis Pell; *Seymour B. Liebman*, attorney for Nathan A. Davis; *Joseph P. Segal*, attorney for Albert R. Sasserath; *Jenks & Rogers*, attorneys for Level Club, Inc.; *Henry M. Flateau*, attorney for Edward H. Hyems and Henry M. Flateau; *Morris J. Junger*, attorney for Morris J. Junger], for the respondents above named.

*John Bogart* [*Abraham P. Wilkes* with him on the brief; *John Bogart*, attorney], respondent in person.

*Leon Lauterstein* of counsel [*Milton Winn, Martin Lippman* and *Emanuel Dannett* with him on the brief; *Lauterstein & Conroy*, attorneys for Ernest Katz; *McLaughlin & Stern*, attorneys for Carl W. Stern], for the respondents above named.

*Charles L. Woody* of counsel [*James M. Gifford* and *Alexander R. Kellegrew* with him on the brief; *Merrill, Rogers, Gifford & Woody*, attorneys], for Irving Trust Company, respondent.

*Murray Sanders* of counsel [*Alexander Rosenbaum* with him on the brief; *Rosenbaum & Sanders*, attorneys], for Alexander Rosenbaum, respondent.

MARTIN, J. The Level Club, Inc., one of the defendants herein, a non-profit association, organized under the Membership Corporations Law, has been sued by the plaintiffs in equity, to rescind the sale of certain collateral serial six per cent coupon notes. The

individual defendants, its officers and directors at the time of the transaction here under consideration, have also been sued for damages for fraud and deceit.

The court dismissed the complaint at the close of the plaintiffs' case as to all the defendants, except the Level Club, Inc., and against the club at the end of the entire case after proof had been adduced by it.

In the year 1928 the Level Club, Inc., issued a series of notes aggregating the sum of $750,000, secured by a second mortgage upon its club house located on West Seventy-third street, near Broadway, borough of Manhattan, and by an assignment of existing subscriptions of members to debenture bonds as well as subscriptions to be thereafter received. The issue of notes was sold outright by the Level Club, Inc., to Sawyer Bros., Inc., at eighty-eight per cent of their face value, under a written contract of sale dated January 31, 1928. Sawyer Bros., Inc., sold one-half of the notes to Cullen & Drew on March 14, 1928. Both of these firms were investment brokers and the respective allotments of notes thus purchased by them were resold for their own account and profit to individuals and institutions, either for investment purposes or for future resale. Many of the notes were taken for investment by State and national banks. A large proportion of the entire issue (less approximately $100,000, par value, of the notes which were redeemed) found their way into the hands of the plaintiffs in this action. The defendant Level Club, Inc., failed and the first mortgage on the premises was foreclosed. The club has been adjudged bankrupt and is wholly unable to meet its notes.

It was established upon the trial that the written agreement of sale of the notes required the Level Club, Inc., to furnish Sawyer Bros., Inc., " with all such information, and in such manner as it [Sawyer Bros., Inc.] shall reasonably require for the purpose of publishing in any prospectus to be issued by it in order to promote the sale of the said notes."

Sawyer Bros., Inc., caused their attorney to prepare a letter setting forth the nature and purpose of the issue, a description of the club and of the properties pledged and assigned as security for the notes. This letter was sent on February 23, 1928, by said attorney to Alexander Rosenbaum, chairman of the Level Club's legal committee, with the request that it be signed by the president of the club. Rosenbaum transmitted it to one Albert R. Sasserath, the secretary, who in turn forwarded it to the president for signature, Sasserath having first examined the statements therein and checked them with the corporate records kept under his supervision. In addition to this check-up, it appears that Sawyer Bros., Inc., or

their representatives examined the club's books and records prior to their preparation of the letter and were familiar with the facts stated therein.

The letter was received by the president who telephoned the secretary, who in answer to the president's direct inquiry informed the latter that the facts had been examined by him and checked with the club's records, and the statements therein had been found to be correct. The president thereupon signed the letter and returned it to the secretary who either directly or through Rosenbaum transmitted it to the attorney for Sawyer Bros., Inc. This letter was incorporated in a prospectus prepared by Sawyer Bros., Inc., and circulated by them and by Cullen & Drew among their customers, some of whom, after reading it, purchased the notes in suit. The material parts of the letter are as follows:

" Referring to the $750,000 Collateral Serial Six Percent (6%) Coupon Notes of Level Club, Inc., which you have agreed to purchase, I take pleasure in giving you the following information:

### " CLUB

" * * * Membership in the Club is limited to members of the Masonic Fraternity. From the original membership of twenty-two, the Club has grown to a present membership of over four thousand. The present membership limit is five thousand, including both resident and non-resident members. Included among the members are Grand Lodge Officers and Past Grand Masters of the Grand Lodge of the Free and Accepted Masons in both the City and State of New York, as well as other States, and also prominent statesmen, jurists, business men and leaders in every walk of life. * * *

### " OPERATION AND EARNINGS

" * * * The annual dues are Sixty Dollars for resident members and Twenty-five Dollars for non-resident members. * * * At the time that the Club property was appraised by Joseph P. Day, Inc., they estimated that its annual income from dues, initiation fees and other Club activities * * * would amount to $789,684, and that its annual expenses for all purposes, but exclusive of interest on these Collateral Serial Six Percent (6%) Coupon Notes, would amount to $423,500, leaving a balance of $366,184 available for the requirements of the sinking fund under the first mortgage of the Club and for the service of this issue, * * *. The first mortgage aforesaid requires the payment by the Club as a sinking fund of $53,550 per year until April 1st, 1931, and $76,500 for the succeeding year, at the end of which period all of these Collateral Serial Six Percent (6%) Coupon

Notes will have been paid. Thus there is a balance of $312,634 available during the first three years of the life of this issue of notes for its service, equal to nearly seven times the maximum interest requirement.

## " Security

" * * * The notes will be secured by

" *First*. The assignment to, and deposit with, American Exchange Irving Trust Company of New York City, as Trustee under a Deed of Trust, of all undelivered debenture bonds of the Club, amounting to approximately $800,000, and all unpaid subscription agreements for such bonds now in the hands of the Club and those to be hereafter received. Each member of the Club is now obligated to purchase at least one $500 debenture bond, for which he may pay either in cash in full or in installments. Out of the total authorized issue of $2,000,000 of such debenture bonds, approximately $1,600,000 have been subscribed for and either fully or partly paid for. All these subscription agreements on the part of the members of the Club are, in the opinion of counsel, assignable and transferable and may be sued upon. Payments on these subscription agreements are being regularly made in an amount in excess of the amount needed to pay the interest on this entire issue of $750,000 Collateral Serial Six Percent (6%) Coupon Notes and to retire $100,000 face value every six months. All moneys payable by the members of the Club upon such subscription agreements will be payable to the Trustee and all moneys received by the Club from the sale of such debenture bonds and upon any such subscription agreements will be paid over to the Trustee, and all such moneys received from both such sources will be exclusively devoted by the Trustee to the payment of the principal and interest of this issue of Collateral Serial Six Percent (6%) Coupon Notes.

" *Second*. A second (closed) mortgage on the land and building of the Club and all the furniture, furnishings, fixtures and equipment therein, subject only to a first mortgage of $2,250,000 * * * and to certain conditional sales agreements covering certain Club furniture and equipment * * *."

After default in the payment of notes, a note holders' committee was organized and this action instituted. Each of the many plaintiffs seeks to recover the amount paid by him for the notes so purchased.

Two distinct causes of action are alleged and two separate remedies are asked. As against the Level Club, Inc., plaintiffs demand a rescission of the transactions whereby they became purchasers of the notes, and a recovery of the amounts paid by

them. As against the individual defendants, the action is in fraud, and money damages are demanded against such defendants upon the theory that plaintiffs were induced to purchase the notes by false statements emanating from the directors and set forth in the letter issued by the club over the signature of its president, and that the individual defendants, officers and directors of the Level Club, Inc., were responsible for its publication by the security brokers who sold the issue to the public.

The liability of the Irving Trust Company, as trustee under the mortgage securing the notes, is predicated upon the claim that it had knowledge of the fact that certain of the statements made in the letter forming part of the prospectus issued by the brokers were false, and continued to act as trustee and aid in carrying out the fraud, notwithstanding such knowledge, to the damage of the plaintiffs who thereafter purchased notes.

The defendants, respondents' main contentions upon this appeal are that the representations made in the prospectus or letter of February 23, 1928, with reference to " these " subscription agreements were not false in fact; that the plaintiffs did not rely upon such representations, even if false; that the element of scienter was not sufficiently proved as to the individual defendants, and that the defendant Irving Trust Company is to be exonerated here if the individual defendants were not guilty of actionable fraud. The defendants insist that the payments being made as stated were sufficient to meet the required payments.

The complaint having been dismissed as against all defendants, except the Level Club, Inc., at the close of plaintiffs' evidence, the sole question as to them to be determined on this appeal is whether or not plaintiffs made out a *prima facie* case. Although it is asserted that every representation contained in the letter was false, it is necessary to refer to a few only in considering the questions presented on this appeal.

There is no doubt that the representations were made in writing for the purpose of selling $750,000 worth of notes and that said representations were false. The only remaining question is the liability therefor. The defendants either knew that the representations were false, or that fact should have been known to them. The most favorable view that might be taken in their behalf is that these statements were recklessly made and asserted to be true.

The letter or prospectus presented such a bright picture of financial strength and ample security as to warrant any prospective investor being induced to buy the notes wholly misled by the statements of fact contained therein. The rule with respect to a

prospectus of this kind is laid down in *Downey* v. *Finucane* (205 N. Y. 251), where the Court of Appeals said: "Where a prospectus is circulated as an inducement to take stock in a corporate enterprise the language of the prospectus is to be interpreted by the effect which it would produce upon an ordinary mind. (*Wiser* v. *Lawler*, 189 U. S. 260, 264.)"

In *Bystrom* v. *Villard* (175 App. Div. 433; appeal dismissed, 220 N. Y. 765; 188 App. Div. 964; affd., 230 N. Y. 588) the court said: "It is urged upon the argument, though seemingly not very confidently, that the statements contained in the prospectus and letters were susceptible of a construction which would make them accord with the real facts. We do not think they were, but even if they had been this would not serve to relieve the respondent from liability. The apparent meaning was just as plaintiff understood, and that there may have been a hidden equivocal meaning which the average person, reading the prospectus, would not discern does not mitigate the offense of uttering a false prospectus."

In considering the proper test to ascertain the true intent of the language used in the prospectus we should find the effect it produced upon the ordinary mind of the average layman. Taking that as a standard we shall now consider the most important representations which were the statements concerning the subscription agreements which were to be assigned to the trustee as the real security and the chief item of collateral protecting the notes.

The general impression created by the prospectus of February 23, 1928, was that the notes were a safe and sound investment. Such impression was created, moreover, almost entirely by the representations concerning the members' subscriptions to debenture bonds. The statements of earnings were, as already noted, admittedly based upon mere estimates, and the second mortgage item of "security" was properly listed as of secondary importance. The one truly unique feature of this issue of notes was that it was ostensibly secured by the best and safest kind of collateral — the personal pledges of thousands of members of a fine social club, each of whom could afford to pay at least $500 for the mere privilege of belonging to the club, together with $25 to $60 in annual dues.

The most vital and important sentence of this prospectus was the following: "Payments on these subscription agreements are being regularly made in an amount in excess of the amount needed to pay the interest on this entire issue of $750,000 Collateral Serial Six Percent (6%) Coupon Notes and to retire $100,000 face value every six months."

If we disregard all of the other representations, this one, which appears to be wholly false, was sufficient to warrant a finding against the defendants. This sentence, in conjunction with other statements in the letter prospectus, was bound to convey to the reader the impression that there were to be assigned to and deposited with the defendant Irving Trust Company, as trustee, subscription agreements upon which the subscribers were still obligated to pay well in excess of $750,000, and that payments on these subscription agreements so to be assigned and deposited, were being regularly paid in an amount in excess of the amount required to pay six per cent interest on the entire issue of notes and to retire $100,000 face value thereof every six months.

No part of this statement was in fact true. The subscription agreements were not being regularly paid. They were at no time sufficient to make the payments as stated. In fact at the times here in question, the club did not have in its hands sufficient agreements upon which sufficient balances were owing to pay the entire issue of $750,000 of notes and to retire them, as they matured $100,000 every six months. The club did not have in its hands as much as $535,000 of such subscription balances. Many of the statements so made did not even approximate the truth.

The appellants very properly ask how could one expect to pay $750,000 and interest with $535,000 of subscription agreements, even assuming they were good.

It appears that the club did not assign to and deposit with the trustee all unpaid subscription agreements then in its hands. The club held back and failed to turn over to the trustee subscription agreements upon which approximately $100,000 remained unpaid. The subscription balances actually assigned to and deposited with the trustee aggregated only $431,269.09.

The respondents say that during the period beginning in January, 1927, to and including February, 1928, the Level Club, Inc., received $294,095.26 on subscriptions. The appellants say that during that same fourteen months' period only $81,399.16 was received on subscriptions; that the $294,095.26 referred to included bonds that were sold outright by the Level Club, payment thereof being made direct to the club.

It is important to note that the payments on these subscription agreements so assigned and deposited were not being regularly met. In fact, in most instances no payments whatever were being made thereon. A witness for plaintiffs testified that payments on these subscription agreements so assigned and deposited were not only not being made in an amount sufficient to pay the interest on the entire issue of $750,000 and to retire $100,000 face value

thereof every six months, but, between December 24, 1926, and March 19, 1928 (a period of fifteen months), the total payments on these subscription agreements were less than $81,400.

The most important misstatement of fact was proved by evidence which established that a great majority of these subscription agreements was utterly worthless, although they were payable within ten months or less and most of them were and had been long in default.

Of the $431,269.09 of subscription balances turned over to the trustee, over $373,000 had remained overdue and uncollected for a period of from five months to six years. At the time the subscription agreements were turned over to the trustee, although they apparently amounted to $431,269.09, of this amount $373,168.25 was owed on subscriptions made prior to December 24, 1926, and the entire $373,168.25 was in default on March 19, 1928. The defaults were not of recent date. At least $109,545 was owed on subscriptions signed in 1925, and at least $123,996.25 was owed on subscriptions signed in 1924, showing a default of three or four years in many of the subscriptions. This is the kind of collateral that was deposited with the trustee as security for the payment of $750,000 worth of notes issued and outstanding. It was substantially the only security for the loan.

The record discloses that the total subscription agreements signed during the years 1922 to 1928 which were assigned to the bank were only $614,600; that of that amount from 1922 to March 19, 1928, $183,330.91 had already been paid thereon and there was due and owing at the latter date only the sum of $431,269.09. The sum of $183,330.91 was nearly all paid prior to the preparation of the prospectus.

The law on this subject is so well settled that citations seem superfluous. (See *Downey* v. *Finucane, supra; Churchill* v. *St. George Development Co.*, 174 App. Div. 1; *Hotaling* v. *Leach & Co.*, 247 N. Y. 84; *The King* v. *Kylsant [Lord]*, L. R. [1932] 1 K. B. 442.) In the last cited case the Court of King's Bench, with its characteristic clearness, sets forth the law as follows: " In the opinion of this Court there was ample evidence on which the jury could come to the conclusion that this prospectus was false in a material particular in that it conveyed a false impression. The falsehood in this case consisted in putting before intending investors, as material on which they could exercise their judgment as to the position of the company, figures which apparently disclosed the existing position, but in fact hid it. In other words, the prospectus implied that the company was in a sound financial position and that the prudent investor could safely invest his money in its debentures. This inference would be drawn particularly from the statement that

dividends had been regularly paid over a term of years, although times had been bad — a statement which was utterly misleading when the fact that those dividends had been paid, not out of current earnings, but out of funds which had been earned during the abnormal period of the war, was omitted."

On this appeal we are not concerned with the liability of the directors who took no part in the transaction. They obtained a dismissal of the complaint by consent of all the parties. However, several of the other defendants were shown to be in charge of and familiar with the books which contained full information on the subject of the subscriptions, the failure to pay same and the numerous defaults in said payments. Other defendants attended and took part in the meeting of the board of directors which approved the transaction by resolution setting forth facts which, if true, made the purchase of the notes a very desirable investment. They not only approved the letter but authorized its issuance. Under well-known principles of law they are liable.

In the case of *Morgan* v. *Skiddy* (62 N. Y. 319, 325) the court said: " The false statement in the prospectus related to an existing fact which materially affected the value of the shares; it was prepared for the purpose of circulation and to induce investments in the stock of the company. If the plaintiff purchased his stock relying upon the truth of the prospectus, he has a right of action for deceit against the person who, with knowledge of the fraud and with intent to deceive, put it in circulation. * * * Mere exaggerated statements of the prospects of a new enterprise will not subject those who make them to liability; but, as was said by the chancellor in *Central Railroad Company* v. *Kisch* [Law Rep. (2 Eng. and Irish App.) 99], ' no misstatement or concealment of any material facts or circumstances ought to be permitted.' "

In *Downey* v. *Finucane* (*supra*) the court said: " Speaking of an equivocal prospectus which was condemned as fraudulent by the House of Lords in *Aaron's Reefs* v. *Twiss* (L. R. [App. Cas. 1896] 273, 285), Lord HALSBURY calls the language ambidextrous; and this expression aptly characterizes that in the present case. In the case cited it was argued, as it is suggested here, that there was no specific allegation of fact which is proved to be false; but the lord chancellor protested against this being regarded as the true test and declared that the question was whether taking the whole thing together was there a false representation. ' I do not care· by what means it is conveyed — by what trick or device or ambiguous language; all those are expedients by which fraudulent people seem to think they can escape from the real substance of the transaction. If by a number of statements you intentionally give a false impres-

sion and induce a person to act upon it, it is not the less false although if one takes each statement by itself there may be a difficulty in showing that any specific statement is untrue.' "

The respondents also contend that there is no liability where one signs a statement without any intention to deceive or to misrepresent the facts. They say they accepted the statement of others and, therefore, are not responsible if the facts were misrepresented. The law does not permit any such excuse to prevail where one knowingly issues or is responsible for the issuance of false representations or recklessly or carelessly issues same. There is no escape from liability in such cases providing the other requirements of an action for false representations are present.

In *Hadcock* v. *Osmer* (153 N. Y. 604, 608) the rule applicable to cases of the character now before the court was stated as follows: " Where a party represents a material fact to be true to his personal knowledge, as distinguished from belief or opinion, when he does not know whether it is true or not and it is actually untrue, he is guilty of falsehood, even if he believes it to be true, and if the statement is thus made with the intention that it shall be acted upon by another, who does so act upon it to his injury, the result is actionable fraud."

In *Bystrom* v. *Villard* (*supra*, at p. 437) the court said: " The necessity for careful accuracy of statement in cases like the present is even more pronounced when the person making the statement holds a position with regard to the matters concerning which the statement is made which imports or implies that he has exceptional knowledge on the subject." (See, also, *Bloomquist* v. *Farson*, 222 N. Y. 375; *Ultramares Corp.* v. *Touche*, 255 id. 170.)

There are a number of questions presented on this appeal relating to the admission and rejection of evidence which it is unnecessary to consider in detail, for the reason that on a new trial they will in all probability not arise. The plaintiffs had a right to show that any of the representations set forth in the letter which were incorporated in the prospectus were false and were known to the defendants to be false. Evidence to show that the earnings were not as represented was also admissible.

The complaint was dismissed at the end of plaintiffs' case as to the directors. The presumptions that may be drawn from the evidence are in favor of plaintiffs. Eliminating, for the purpose of this appeal, the rejected testimony, the plaintiffs made out a *prima facie* case. The complaint should not have been dismissed as to any of the defendants. If the plaintiffs show that the defendant Irving Trust Company aided and abetted in carrying out the misrepresentations, that defendant may be liable to the extent of

the damage caused by such acts. On a new trial, when all of the admissible evidence is permitted, its liability may be determined.

On a new trial the court will be able to determine from the evidence whether Sawyer Bros., Inc., were responsible for any of the fraudulent representations made to the public as an inducement to sell the notes in question. If it should be established that they were actual participants in the fraud, they would at least be precluded from personally recovering against defendants in this action.

On the evidence before the court, the Level Club, Inc., is unquestionably liable for damages. The extent of the liability of all the defendants may be determined on the new trial.

The judgment so far as appealed from should be reversed and a new trial granted, with costs to the appellants to abide the event.

FINCH, P. J., O'MALLEY, TOWNLEY and GLENNON, JJ., concur.

Judgment so far as appealed from reversed and a new trial granted, with costs to the appellants to abide the event. Settle order on notice.