Vincent A. Lupiano, J.
 

 This is an action on a contract of guarantee. The complaint alleges, in the same cause of action, breach of contract and fraud in the inducement. The avowed purpose of the charges of fraud is to bring the action within subdivision 9 of section 826 of the Civil Practice Act which authorizes arrest in a contract action where there has been fraud in the inception of the agreement. These allegations of fraud, however, do not change the nature of the action which is upon the contract
 
 (Hoboken Beef Co.
 
 v.
 
 Loeffel,
 
 52 Hun 611;
 
 McDonough
 
 v.
 
 Dillingham,
 
 43 Hun 493, 497;
 
 Elwell
 
 v.
 
 Russell,
 
 29 App. Div. 436, 438-439;
 
 Berkner
 
 v.
 
 Rubin,
 
 145 Misc. 666); and a finding of fraud would only have the effect of entitling the plaintiff to an order of arrest. Failure to prove the fraud would merely render those allegations as surplus and harmless
 
 (Novotny
 
 v.
 
 Kosloff,
 
 214 N. Y. 12, 15, 16;
 
 Ovenshire
 
 v.
 
 Forth,
 
 192 N. Y. S. 760, 761) and would not affect the contract action. This is the law of the case (N. Y. L. J., Jan. 20,1956, p. 8, col. 1).
 

 
 *414
 
 Basically, the questions to be determined are (1) whether there was a breach of the contract of guarantee and damages resulting therefrom and (2) was there fraud in the inducement.
 

 The facts are that the plaintiff, Eastern Capital Corporation, in. 1952 was a finance corporation then engaged in factoring accounts receivable of the Abbey-Ortner Lamp Co. Inc. and Royal Lamp Shade Co. Inc. (The afore-mentioned corporations shared a common interest and shall hereinafter be referred to as Abbey-Ortner Lamp Co. Inc.). The president of AbbeyOrtner, in order to obtain a loan of $10,000 from the plaintiff requested the defendant, Walter Freeman, to guarantee repayment. On August 15, 1952, the defendant addressed a letter to the plaintiff which stated in part ' ‘ If you will make a loan in the sum of Ten thousand Dollars ($10,000) to both the aforementioned corporations, .1 herewith unconditionally guaranty that upon the failure of either, or both * * * to repay you the whole of the unpaid principal of the said loan ” etc.
 

 On September 3, 1952, the plaintiff wrote to the defendant,
 
 “
 
 in clarifying your guaranty to us of the repayment of the loan that we are making * * * you will please be advised that it is our intention * * * that the principal of this loan shall be reduced * * * out of the equity moneys coming into possession of Eastern Capital Corporation by virtue of the accounts receivable contract between Eastern Capital Corporation and Abbey-Ortner Lamp Co. Inc.”
 

 On October 21, 1952, the plaintiff again wrote the defendant, ‘ ‘ Pursuant to our recent telephone conversation, this letter will officially notify you of the fact that we are this day completing our loan * * * Pursuant to the guaranty set forth in your letter to us dated August 15, 1952, we shall keep you advised from time to time as to how the Abbey business is going ’ ’. Abbey-Ortner Lamp Co. Inc. defaulted in repayment of the loan and on May 13, 1953 the plaintiff demanded that the defendant pay $10,000 and interest as guarantor of the loan.
 

 The defendant does not deny that there was a default or that he failed to make payment as guarantor. However, he alleges as an affirmative defense and counterclaim that the letters of September 3, 1952 and October 21, 1952 were modifications of the contract of guarantee and that the plaintiff failed to perform the conditions stated therein. The plaintiff argues that the offer of August 15, 1952 resulted in an unconditional contract of guarantee unchanged by the afore-mentioned letters.
 

 The law is that a contract of guarantee must be in writing (Personal Property Law, § 31, subd. 2) and is to be interpreted in the same manner as any other contract
 
 (Smith
 
 v.
 
 Molleson,
 
 
 *415
 
 148 N. Y. 241). Accordingly, the letter of August 15, 1952 was a contractual offer to guarantee a loan. Such an offer, fully written and signed by the offeror, does not establish a contract until acceptance or performance (1 Corbin on Contracts, § 31, p. 86;
 
 Farago
 
 v.
 
 Burke,
 
 262 N. Y. 229;
 
 St. Regis Paper Co.
 
 v.
 
 Hubbs & Hastings Paper Co.,
 
 235 N. Y. 30). Thus the lending of $10,000 to Abbey-Ortner on October 21, 1952 became the acceptance of the offer of August 15 completing the contract of guarantee. The letters of September 3 and October 21, 1952, in my mind, are nothing more than gratuitous expressions of accommodation or expectation. And the language therein precludes any other finding. Such phrases in the letters as “it is our
 
 intention
 
 * * * that the principal of this loan shall be reduced from time to time ” and “ It is
 
 contemplated
 
 that the entire amount of the loan will be liquidated within a period of one year ” is not binding language of commitment with conditioning effect. Moreover, the letters of September 3 and October 21, cannot be considered counteroffers or rejections. It is inconceivable that the plaintiff would make a counteroffer more disadvantageous to himself than the original offer, when it is legally evident that the mere act of lending the money could have created a binding contract without anything more. Clearly, therefore, the acceptance of the August 15 offer, by subsequent performance, was unequivocally made. The consideration bargained for was the loan of $10,000 in return for an unconditional guarantee of
 
 repayment.
 
 The statements in plaintiff’s letters as to what was contemplated with respect to the manner of repayment were merely incidental to the unconditional contract of guarantee and have no legal impact thereon
 
 (Knudtsen
 
 v.
 
 Remmel,
 
 141 App. Div. 445). Even assuming
 
 arguendo
 
 that the letters of September 3 and October 21 did impose, conditions, there is a total failure of proof that any conditions were breached by the plaintiff or that damages resulted therefrom. In this vein, the contention of the defendant that the plaintiff did not apply equity money to the contract is not supported by the evidence. It is undisputed that while Eastern Capital factored Abbey-Ortner no equity moneys remained as a result of the collection of accounts receivable and there was a resultant net loss to Eastern of $3,620.14. Moreover there is no showing that the defendant was damaged by the failure of the plaintiff to notify him
 
 ' ‘
 
 how the Abbey business is going ”. Accordingly, I find that the defendant breached the contract of guarantee and damages of $10,000 with interest thereon at the rate of 1/12% per day from October 21, 1952 resulted therefrom,
 

 
 *416
 
 As to the question of fraud in the inducement, the facts are that the offer of the defendant of August 15,1952 states in part ‘
 
 ‘
 
 Knowing full well that you rely upon my credit and financial standing to repay such a loan to you * * * I herewith make the following statements and undertake the following obligation * * * I am the sole owner of all of the issued and outstanding capital stock of Philip Freeman Co. Inc. * * * My individual net worth, over and above all my obligations of every kind nature and description, is at least the sum of Three Hundred Thousand Dollars ($300,000.00) ”.
 

 The plaintiff contends that it was reliance upon this representation which induced it to make the loan; that the representation was false and known as such by the defendant, made for the purpose of inducing plaintiff to make the loan.
 

 The uncontroverted evidence is that the defendant’s only asset as of August 15, 1952, the date of the representation, was his interest in the Philip Freeman Co., Inc. He was the sole stockholder and owner of that company. He concedes that his total individual liabilities as of August 15,1952 were $657,354.76, comprising his debt to Philip Freeman Co., Inc. of $307,354.76 and his debt to his father’s estate of $350,000. It becomes necessary, therefore, to determine the net worth of the Philip Freeman Co., Inc. as of August 15 so as to ascertain the individual net worth of the defendant. Net worth may be concluded by subtracting liabilities from assets or, more simply, by adding the capital account and surplus account as reflected in the general ledger of the corporation. The general ledger of Philip Freeman Co., Inc. for 1952 was introduced into evidence. It reveals that on January 1, 1952 the balance of the capital account and the balance of the surplus account totaled $326,313.56 which defendant avers was the then net worth of the Freeman Company. The ledger of Philip Freeman Co., Inc. on December 31, 1952 shows an increase of $44,594.94 in the net worth of the corporation. The defendant further stated that no dividends were paid in 1952, that there was no loss from the sale of goods, that no additions were made to capital and that the only losses from outside business ventures during the year occurred after August 15, 1952. This increase may be taken to represent the profits of the corporation for the year 1952, and even assuming that all such profits were earned before August 15, the net worth of the corporation would only be $371,908.50 at that time. Against this figure the defendant had personal liabilities of $657,354.76 and it must be added that the debt owed by the defendant to the corporation was carried on the corporate books as an asset.
 

 
 *417
 
 The defendant’s explanation as to how he arrived at a greater net worth than the one indicated in the ledger is unbelievable. His estimate of profit of Freeman Co., Inc. for the year 1952 of $150,000 appears to be an arbitrary figure, not reflected in the ledger or any of the financial transactions of the company. Even if it were true it would not materially change the insolvent position of the defendant when the representation was made. Nor is his attempt to increase the value of his inventory, carried on the ledger on January 1,1952 at $69,578 to a value of- $300,000 to $400,000, credible. The financial picture of the corporation indicates that sales were poor in the first half of 1952; corporate purchases made during that period would only belie the asserted scarcity of merchandise and that the inventory valued at $25,000 could have been sold for a price of $375,000 to $475,000. Lastly, I find that the loan made to Amco Metal Co. and the one to Spieler which defendant urges should enhance the net worth cannot operate as such since these assets were included and considered in the net worth evaluation, reflected in the ledger of 1952. Ultimately, I find that the defendant’s representation that his net worth was over $300,000 was false; in fact, he was personally insolvent at the time the offer of August 15, 1952 was made.
 

 Intent to defraud may be shown by circumstantial evidence
 
 (Holden
 
 v.
 
 Burnham,
 
 63 N. Y. 74;
 
 Altman
 
 v.
 
 Finkel,
 
 268 App. Div. 666;
 
 Armstrong
 
 v.
 
 Herman,
 
 229 App. Div. 162). A discrepancy as to the true picture of financial condition as great as the one here indicated is strong proof of fraudulent intent and knowledge
 
 (Cacicedo
 
 v.
 
 McAteer,
 
 220 App. Div. 186;
 
 Armstrong
 
 v.
 
 Herman, supra).
 
 Nor may the defendant deny fraud by asserting lack of knowledge. A person representing a material fact to be true when he does not know whether it is true, or carelessly or recklessly issues such a false representation, knowing it will be acted upon is guilty of actionable fraud
 
 (Hadcock
 
 v.
 
 Osmer,
 
 153 N. Y. 604;
 
 First Nat. Bank of Hempstead
 
 v.
 
 Level Club,
 
 241 App. Div. 433;
 
 Brystrom
 
 v.
 
 Villard,
 
 175 App. Div. 433, appeal dismissed 220 N. Y. 765;
 
 Berlin Constr. Co.
 
 v.
 
 Hoops,
 
 185 App. Div. 277). I therefore conclude that the defendant was guilty of fraud in the inducement of the contract of guarantee.
 

 This constitutes the decision of the court in conformity with section 440 of the CiviFPractice Act. All motions upon which decision was reserved are disposed of in conformity herewith. The clerk is directed to enter judgment accordingly. Twenty days’ stay of execution; 60 days to make a case.