**CINERAMA, INC., a New York corporation, Plaintiff,**

v.

**SWEET MUSIC, S.A., a Swiss corporation, and Union Bank of Switzerland, a Swiss corporation, Defendants.**

**No. 71 Civ. 1876.**

United States District Court, S. D. New York.

Sept. 18, 1972.

---

Harry B. Swerdlow, Beverly Hills, Cal., Paul Ferber, Benjamin Rockmore, Seward & Kissell, New York City, for plaintiff.

Sullivan & Cromwell, New York City, for defendant Bank; John Dickey, John Timbers, New York City, of counsel.

Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, for defendant Sweet Music.

## MEMORANDUM

TENNEY, District Judge.

Defendant Union Bank of Switzerland (hereinafter the "Bank") moves this Court for summary judgment pursuant to Fed.R.Civ.P. 56: (1) granting its counterclaim against plaintiff Cinerama, Inc. (hereinafter "Cinerama") to the extent of $1,825,000 plus interest and costs, and (2) dismissing Cinerama's complaint insofar as it seeks a declaratory judgment that Cinerama is not liable to the Bank upon its written guarantee of payment of obligations owed to the Bank by Sweet Music, S.A. (hereinafter "Sweet Music"). Jurisdiction is founded upon 28 U.S.C. §§ 1332, 2201 (1970). For the reasons cited *infra*, defendant's motion is partially granted.

By way of background, in August 1969 Cinerama, a publicly owned New York corporation, and Sweet Music, one of a group of Swiss corporations owned and controlled by Harry Saltzman, a motion picture producer, commenced negotiations for the production by Sweet Music and distribution by Cinerama of a motion picture to be entitled "Toomorrow". Sweet Music already had embarked upon production of the film, but needed additional funds to complete it. The parties contemplated that Cinerama would guarantee a loan from the Bank to Sweet Music to finance the production of "Toomorrow", and that Cinerama in return would receive distribution rights in certain geographic territories. Negotiations between Cinerama and Sweet Music were handled principally by Benjamin Rockmore, general counsel for Cinerama, and Irving Moskovitz and Peter Schiller, New York counsel for Sweet Music and Harry Saltzman. Moskovitz and Schiller also handled the negotiations between Sweet Music and the Bank. The negotiations between Cinerama and Sweet Music resulted in a written contract dated September 11, 1969 (hereinafter the "Agreement"), signed by Cinerama and delivered to Schiller on October 7, 1969, together with a written guarantee of that date in letter form signed by George F. Wiemann, Cinerama's Vice President-Finance and addressed to the Bank (hereinafter the "Guarantee"). On that same day, Schiller forwarded these and other documents to Sweet Music. On October 15, 1969, the Bank approved the loan and, between October 16, 1969, and January 28, 1970, Sweet Music withdrew the full amount of the loan—9,000,000 Swiss Francs. (Berdoz Affid. ¶ 4, Exh. B.) Thereafter relations between Cinerama and Sweet Music deteriorated because Sweet Music allegedly failed to live up to its obligations under the Agreement. By letter dated November 5, 1971 (Berdoz Affid., Exh. C), the Bank demanded repayment of the loan from Sweet Music, and since Sweet Music is now in default, the Bank seeks to enforce Cinerama's October 7, 1969, Guarantee.

In an effort to avoid liability, Cinerama argues first that Sweet Music had no authority to deliver the Guarantee to the Bank as anything but a "proposed" Guarantee. This contention is without

merit. Nowhere on its face is there any indication that the document was to be regarded as a "proposed" Guarantee. Moreover, the facts set forth in Schiller's affidavit in support of the Bank's motion for summary judgment, which are uncontroverted by the opposing affidavits, show beyond doubt that Sweet Music was authorized to deliver the Guarantee to the Bank as a fully operative instrument.

As is evidently customary in the motion picture business, paragraph J–1 of the Agreement required that Sweet Music provide Cinerama with a completion bond from a third party in order to assure Cinerama that should the production costs of the film exceed the amount of the anticipated loan from the Bank plus money already invested from other sources, an additional sum would be made available by the third party to complete the film and deliver it to Cinerama. Accordingly, Sweet Music arranged for Crown Agents in London (hereinafter "Crown") to provide a completion bond in favor of Cinerama. Crown sent the bond to Schiller prior to October 7, 1969, for delivery to Cinerama on the condition that Schiller effect delivery only after Crown received assurance that $250,000 or one million Swiss Francs would be made available to them in the event they had to advance money under the bond. The Bank was prepared to provide Crown with the necessary deposit or assurance, but only on condition that it first received Cinerama's Guarantee for the loan to Sweet Music. In view of this situation, on October 3, 1969, Schiller and Rockmore agreed that Cinerama would execute the Guarantee so that it could be delivered to the Bank. In order to protect Cinerama from the risk that Crown would not receive the deposit or assurance it sought from the Bank, thereby preventing Schiller from delivering the bond to Cinerama, Rockmore extracted additional personal promises from both Saltzman and Moskovitz that the completion bond be delivered promptly and that the other documents involved in the transaction be duly signed and de-

livered. If all was not accomplished by October 31, 1969, Cinerama's Guarantee was to be returned. This agreement was reduced to a letter drafted by Schiller and dated October 3, 1969 (Schiller Affid., Exh. A), and delivered by him to Cinerama on October 7, along with the written promises of Saltzman and Moskovitz. (Schiller Affid., Exhs. B, C.) In return, Schiller received from Cinerama the signed Guarantee and Agreement which he immediately forwarded to Sweet Music in Switzerland. On the same day, Schiller sent a telex to Sweet Music advising them that the documents were on the way, and outlining Sweet Music's obligations under the October 3 letter agreement. (Schiller Affid., Exh. E.) Thereafter, on October 10, 1969, the Bank issued its guarantee to Crown for one million Swiss Francs for the completion bond. (Schiller Affid., Exh. G.) On October 14, 1969, the signed documents referred to in the October 3 letter agreement were delivered to Cinerama (Schiller Affid., Exh. F), and on October 20, 1969, Crown's completion bond was delivered. (Schiller Affid., Exh. I.)

Therefore, the terms under which Cinerama agreed its Guarantee was to be delivered to the Bank were completely satisfied by Sweet Music, so that no basis in fact exists for Cinerama's contention that Sweet Music was not authorized to effect delivery. Moreover, even if the terms of the October 3 letter agreement were not satisfied, by placing the completed Guarantee in the hands of Sweet Music, Cinerama clothed Sweet Music with apparent authority to deliver it to the Bank. Belloni v. Freeborn, 63 N.Y. 383, 389 (1875); Russell v. Freer, 56 N.Y. 67, 71 (1874); 10 Williston on Contracts, § 1244, at 783–84 (3d ed. 1967).

Second, Cinerama contends the loan to Sweet Music was made in reliance upon Saltzman's line of credit with the Bank, and not in reliance upon the Cinerama Guarantee, postulating that the Guarantee was not delivered to the Bank until after the loan already had been made. Cinerama sets forth no facts, however, to support this conclusion, and

facts, not hypotheses, must be averred to raise the issue. *See* Turner v. Lundquist, 377 F.2d 44, 48 (9th Cir. 1967); Mertens v. Agway, Inc., 278 F.Supp. 95, 99 (S.D.N.Y.1967). In paragraph 3 of his affidavit Philippe de Weck, the Bank's General Manager responsible for approving the extension of credit to Sweet Music, states that the Guarantee "had been delivered to Union Bank and was in the Bank's possession, when the loan to Sweet Music was approved on October 14, 1969." Although de Weck does not explicitly state the exact time and manner in which the Guarantee was obtained by the Bank, such a determination is not crucial to the issue of reliance. It is undisputed that Cinerama fully intended to guarantee the loan and for that reason gave Sweet Music the Guarantee on October 7, 1969, for transmission to the Bank. The Bank's "Protocol" dated October 13, 1969, (in which are described the terms of the proposed loan to Sweet Music, the security offered, and the bases for the Branch Office's recommendation that the loan be made) states: "The Cinerama Inc. of New York . . . has already declared itself willing to guarantee the credit in question," and goes on to outline the results of a credit check on Cinerama, and finally concludes with a recommendation that the loan be made "[i]n view of . . . [*inter alia*]—the financial position of the guarantor." (de Weck Affid., Exh. A.) Moreover, the loan agreement between Sweet Music and the Bank, a copy of which was sent to Rockmore by Schiller on October 28, 1969, states that the Bank was placing at Sweet Music's disposal a credit of 9,000,000 Francs "in consideration of the guarantee in the same amount of Cinerama, Inc., New York." (Rockmore Affid., Exhs. 10, 11.) Therefore, whether or not the Bank actually had the Guarantee in hand on October 15 when the loan was approved, or whether the Bank received it a few days

later, the Protocol and loan agreement clearly show that the Bank was induced to advance credit to Sweet Music in reliance upon Cinerama's promise to add its Guarantee as surety. *See* McNaught v. McClaughry, 42 N.Y. 22, 24 (1870); Chester Airport, Inc. v. Aeroflex Corp., 37 Misc.2d 145, 237 N.Y.S.2d 752 (Sup. Ct.1962), modified, 18 A.D.2d 998, 238 N.Y.S.2d 715 (1963).

Third, Cinerama contends that the Bank never accepted its Guarantee: (1) because the terms of the Bank loan to Sweet Music were different from the terms of the loan guaranteed by Cinerama; and (2) because the Bank tried to get Cinerama to sign its own form of Guarantee. Alternatively, Cinerama argues that the terms of the loan were different from the loan Cinerama contemplated guaranteeing, so that Cinerama has been discharged from its obligation of repayment.

At this point it is necessary to examine the Guarantee, which is set forth below, keeping in mind that it was drafted by Cinerama (in fact, by its general counsel, Rockmore), and is therefore to be construed strictly against it.

[Cinerama Letterhead]

October 7, 1969

Union Bank of Switzerland
Zurich, Switzerland

Re: Toomorrow

Gentlemen:

Enclosed herewith is a true copy of an Agreement dated as of September 11, 1969 between Sweet Music, S.A. and Cinerama, Inc., (the "Agreement") with respect to the above Photoplay.

In order to induce you to lend to Sweet Music, S.A. in connection with the production by Sweet Music, S.A. of the Photoplay, the Swiss Franc equivalent to $2,100,00 [1] (U.S.) or such lesser sum as is referred to below,

---

1. As the papers submitted with regard to this motion raise no issue as to this figure, I am assuming that "$2,100,00" is a typographical error which should read "$2,100,000".

Cinerama, Inc., hereby unconditionally guarantees the repayment of said loan in U.S. Dollars together with interest thereon at a rate not to exceed 10% per annum, provided however, that said loan shall not be required to be repaid sooner than two years from the date of the first borrowings thereunder.

It is expressly understood that the Net Producer's Share, as said term is defined in the Agreement, shall be paid to you and applied by you in reduction of the loan and the obligations of Cinerama, Inc., hereunder.

It is further expressly understood that in the event Cinerama, Inc., is required to pay any portion of the amounts guaranteed hereunder, Cinerama, Inc., shall be subrogated to your rights and interests, if any, in the Photoplay and in any note or loan agreement made by Sweet Music, S. A. to you in connection with the Photoplay.

It is further expressly agreed that in the event the National Broadcasting Company has not served written notification on or before November 30, 1969, of a date not later than April 30, 1970, on which the television special referred to in Paragraph K of the Agreement will be broadcast over its network in the U.S. during prime time, the maximum loan to be made by you to Sweet Music, S.A. upon the security of the guarantee of Cinerama, Inc., shall be the sum of $1,825,000.

Very truly yours,
CINERAMA, INC.
By: /s/ George F. Wiemann
Vice-President

On the face of this document, the only terms prescribed for the loan relate to its amount and duration. As to amount, the loan agreement states that a credit of 9,000,000 Swiss Francs would be placed at Sweet Music's disposal, and there would appear to be no fact issue with regard to that amount being the equivalent of $2,100,000. Cinerama argues, however, that the Guarantee required the loan to be in dollars, not francs. This Court is at a loss to discern the basis for this argument when the Guarantee plainly states that the amount of the loan be "the Swiss Franc equivalent of $2,100,00 [*sic*] (U.S.)."

As to duration, the loan agreement states:

"As we have agreed, our advance is granted to you for a period of 2 years, that is, until the end of *October 1971*. For all useful purposes, we must however specify that, despite this expiration date, our debt shall remain payable on sight at all times, pursuant to our general conditions . . . ." (Rockmore Affid., Exh. 10.)

Cinerama argues that the language from the loan agreement quoted *supra* shows that the loan was payable on demand, and therefore was not the type of loan contemplated by the Cinerama Guarantee. The Guarantee, however, is conditioned upon the fact that *"said loan shall not be required to be repaid* sooner than two years from the date of the first borrowings thereunder"* (emphasis added), and the loan agreement specifies that "our advance is granted to you for a period of two years, that is, until the end of *October 1971*." The clause in the loan agreement which provides that "our debt shall remain payable on sight at all times" evidently was inserted to avoid a Swiss stamp tax which results if a loan is granted for a period of two years or more, but which does not arise if in form the loan is not necessarily for two years. (Rockmore Affid., Exh. 18.) In fact, the Bank made no demand for repayment until November 5, 1971, more than two years after the loan had been made. (See Berdoz Moving Affid., Exh. C.) Therefore, the terms of the loan made by the Bank coincide with the terms of the loan guaranteed by Cinerama as set forth in the Guarantee.

In its opposing papers, Cinerama fails to take cognizance of the distinction between the *terms of the loan made to Sweet Music* and the *scope of Cinerama's obligation of repayment.* Although New York case law holds that the obligation of a guarantor is *strictissimi juris,* *i. e.,* any alteration in the loan made without the consent of the guarantor, whether or not material, operates as a discharge (Page v. Krekey, 137 N.Y. 307, 314, 33 N.E. 311, 313 (1893); 100 Parkway Road, Inc. v. Johns-Manville, Inc., 258 A.D. 736, 14 N.Y.S.2d 830 (1939), aff'd, 285 N.Y. 747, 34 N.E.2d 906 (1941)), it is likewise clear that a guarantor can limit the scope of its guarantee. *See* Powers v. Clarke, 127 N.Y. 417, 424, 28 N.E. 402, 404 (1891); M. Lowenstein & Sons v. Roselle Manufacturing Co., 9 Misc.2d 617, 171 N.Y.S.2d 7 (Sup.Ct.1958), aff'd mem., 8 A.D.2d 592, 185 N.Y.S.2d 216 (1959); 4 Corbin on Contracts, ¶ 926, at 705 (1951). That is exactly what Cinerama did here. By the terms of the Guarantee set forth *supra,* Cinerama promised repayment in dollars, not francs (¶ 2); limited the interest it would repay on the loan to 10% (¶ 2); and limited the principal amount of the loan it guaranteed to repay to $1,825,000 in the event a certain occurrence did not take place (¶ 5). Since that event failed to occur, the Bank in its motion for summary judgment properly seeks to recover only $1,825,000 of the principal amount of the loan. Also, since the interest rate on the loan never exceeded 9½% (Berdoz Affid., Exh. B), the Bank properly seeks recovery of interest equal to the dollar value of 1,394,984 Swiss Francs.

In further support of its argument that it was discharged, Cinerama contends that because the Guarantee provides that a copy of the September 11, 1969, Agreement between Cinerama and Sweet Music is enclosed (¶ 1), that document is incorporated by reference into the Guarantee, making Cinerama's obligation thereunder subject to certain conditions expressed in the Agreement (which conditions allegedly were not satisfied by Sweet Music). No basis in fact exists for this contention. Nothing in the Guarantee suggests that there were terms in the Agreement to which the loan had to conform, or that Cinerama's Guarantee was conditioned upon any provisions in the Agreement. The only references to the Agreement in the Guarantee are in paragraph three, which promises additional security for the loan in the form of "the Net Producer's Share, as said term is defined in the Agreement" and in paragraph five, which limits the principal amount of the loan to be made upon the security of Cinerama's Guarantee to $1,825,000 in the event a certain occurrence did not take place. Since this occurrence is described fully in the Guarantee itself, the mention of the Agreement in that paragraph is gratuitous.

The rule of law is that "[w]here the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law, and parol evidence is not admissible as an aid in interpretation; no trial is necessary to determine the legal effect of the contract . . . ." General Phoenix Corp. v. Cabot, 300 N.Y. 87, 92, 89 N.E.2d 238, 241 (1949). *See also* James Talcott, Inc. v. Bloom, 29 A.D.2d 390, 391, 288 N.Y.S.2d 398, 400 (1968). The specificity of Cinerama's Guarantee as to the terms of the loan, the scope of each party's obligations and Cinerama's rights of subrogation (¶ 4) make that document unambiguous and complete. Therefore, any reference to extraneous facts or documents to determine the intent of the parties is unnecessary.

Cinerama's reliance upon Burston v. Garret Building Corp., 252 N.Y. 230, 169 N.E. 287 (1929) and Creamer v. Mitchell, 162 N.Y. 477, 56 N.E. 977 (1900) is misplaced. In both those cases the beneficiary of the guarantee was also a party to the underlying contract to which the guarantee made reference.

Therefore, there was no question that the beneficiary was aware of its terms. Here, the Bank was not a party to the Cinerama-Sweet Music Agreement, and under these circumstances the mere statement in the Guarantee that the Agreement is "enclosed" is not sufficient to incorporate that document into a Guarantee complete on its face.

■ With regard to acceptance, the general rule is that unless notice of acceptance is required by the terms of a guarantee, the making of the loan constitutes acceptance by the bank of the guarantor's offer of surety. American Woolen Co. v. Moskowitz, 159 A.D. 382, 384, 144 N.Y.S. 532, 534 (1913); Eastern Capital Corp. v. Freeman, 10 Misc. 2d 412, 415, 168 N.Y.S.2d 834, 837 (Sup.Ct.1957), aff'd mem., 8 A.D.2d 782, 187 N.Y.S.2d 978 (1959); 1 Corbin on Contracts, ¶ 68, at 283 (1963). In the instant case, the Guarantee contains no notice requirement. It is undisputed, however, that the loan actually was made and it is clear that its terms coincided with those set forth in the Guarantee.

■ Cinerama argues, however, that its Guarantee was not accepted by the Bank because the Bank attempted to get Cinerama to sign its own form of guarantee. The Bank did send a copy of its own form of guarantee to Sweet Music for execution by Cinerama along with the loan agreement in October 1969, but Sweet Music failed to forward the Bank's guarantee to Cinerama until the middle of December. The Bank's form of guarantee, in contrast to the Cinerama Guarantee, was unconditional. Therefore, upon receiving it, Cinerama revised it and on March 4, 1970, forwarded it to Schiller for transmission to the Bank. (Rockmore Affid., Exhs. 20, 21, 23.)

As a matter of law, this attempt by the Bank to improve its security did not constitute rejection of the security it already held in the form of Cinerama's October 7, 1969, Guarantee. American Woolen Co. v. Moskowitz, *supra*, 159 A.D. at 384, 144 N.Y.S. at 534. Since Cinerama's Guarantee had already been accepted by the Bank when it made the loan to Sweet Music, the subsequent exchange of letters between Cinerama and the Bank, through Sweet Music, at most amounted to a proposed amendment to Cinerama's Guarantee by the Bank, which was rejected by Cinerama when it revised the proposed amendment. Cinerama's revision of the Bank's proposed amendment in turn constituted a counteroffer by Cinerama to amend the original Guarantee which counteroffer was never accepted by the Bank, and which in fact was later withdrawn by Cinerama. (Rockmore Affid., Exh. 25.) This interpretation of the facts is borne out by a letter dated May 18, 1970, from Rockmore to Sweet Music which refers to Cinerama's counteroffer no less than three times as "a proposed agreement with the Union Bank of Switzerland *amending the guarantee to the Union Bank of Switzerland previously signed by us.*" (Emphasis added.) (Rockmore Affid., Exh. 26.) These admissions, made long after the loan transaction had been completed and the money loaned, clearly demonstrate that Cinerama knew its October 7, 1969, Guarantee had been effectively delivered to the Bank, was in full force and effect, and required formal amendment if its terms were to be altered.

■ Lastly, Cinerama requests this Court to permit further discovery of the files and records of the Bank, Sweet Music and its attorneys and to permit depositions of Schiller, Moskovitz and certain Bank officials prior to ruling on defendant's motion for summary judgment. Under the circumstances, the Court is not persuaded that further discovery would be fruitful, but rather would be in the nature of a fishing expedition on the part of Cinerama. The evidence already submitted in the form of voluminous affidavits and exhibits

overwhelmingly points to Cinerama's liability to the Bank on its October 7, 1969, Guarantee. Moreover, Cinerama made no attempt to initiate discovery until the original return date of the Bank's motion for summary judgment on February 8, 1972—almost six months after issue was joined on July 20, 1971. On that date, Cinerama for the first time claimed a need for discovery from the Bank. Between February 8 and February 29, the adjourned motion date, Cinerama brought on a motion for production of documents. On February 22, 1972, with the assistance of the magistrate, a stipulation was agreed to between Cinerama and the Bank covering the documents to be produced, and all production was completed by February 24, 1972. Aside from referring in open court on February 8 to the need for depositions, Cinerama did nothing further along this line.

Therefore and for the foregoing reasons, the Bank's motion for summary judgment pursuant to Fed.R.Civ.P. 56 is partially granted to the extent: (1) that Cinerama is held liable to the Bank for $1,825,000 on its October 7, 1969, Guarantee, plus costs; and (2) that Cinerama's complaint, insofar as it seeks a declaratory judgment that Cinerama is not liable to the Bank upon its written guarantee of payment of obligations owed to the Bank by Sweet Music is dismissed. Fact issues still remain, however, with regard to the amount of interest for which Cinerama is liable to the Bank, specifically: (1) the amount of interest in Swiss Francs due on the principal amount of Cinerama's liability from October 15, 1969, to October 31, 1971; (2) the official exchange rate between dollars and Swiss Francs on the applicable date; and (3) interest at the "contract rate of 8½%" referred to in the Bank's brief for the period after the loan became due.

So ordered.