PFIZER, INC., et ano., Plaintiffs,

v.

STRYKER CORPORATION,
et ano., Defendants.

No. 02 Civ.8613(LAK).

United States District Court,
S.D. New York.

Dec. 2, 2004.

Charles B. Updike, Beth L. Kaufman, Schoeman, Updike & Kaufman, LLP, New York, NY, for Plaintiffs.

Herbert J. Stern, Joel M. Silverstein, Stern & Kilcullen, Roseland, NJ, for Defendants.

## MEMORANDUM OPINION
### (Corrected)

KAPLAN, District Judge.

In 1998, Pfizer, Inc. and MTG Divestitures, Inc. (collectively "Pfizer") sold its prosthetic joint and implant business to Stryker Corp. and Howmedica Osteonics Corp. (collectively "Stryker") for $1.6 billion. The pertinent agreements provided, broadly speaking, that Pfizer would retain liability for third party product liability claims arising in respect of prosthetic joints sold prior to the closing, while Stryker would be responsible for claims relating to joints sold after the closing. Once the deal closed, however, the parties each sought to shift responsibility to the other with respect to a particular prosthetic joint, the Duracon Uni–Compartmental Knee, on a variety of theories. Discovery having concluded, Pfizer moves for partial summary judgment on certain of its

claims. Both sides move for summary judgment on certain of Stryker's counterclaims.

## I

### A. *The Duracon Uni–Compartmental Knee*

The Duracon Uni–Compartmental Knee system ("DUK") is a prosthetic knee implant that was manufactured by Howmedica, Inc., a former Pfizer subsidiary, and used to replace a part or a condyle of a knee.[1] The DUK has two components, a femoral piece made of cobalt chrome and a tibial component made of ultra high molecular weight polyethylene ("UHMWPE") packaged in standard atmospheric conditions and sterilized through a process of gamma sterilization in air, also known as conventional radiation sterilization.[2]

The DUK first was approved by the FDA in 1993. The tibial components were manufactured in Limerick, Ireland, between May and September of 1993 and shipped to Pfizer's Rutherford, New Jersey warehouse for distribution in the United States.[3] As a result of Pfizer's effort to redesign the femoral component, however, the DUKs were not distributed in the United States until May of 1997.[4]

UHMWPE degrades over time when not implanted.[5] In accordance with FDA regulations, Pfizer adopted a policy in 1996 that all conventionally radiation sterilized UHMWPE products should not be sold for implementation more than five years after their manufacture.[6] Pfizer's policy also prohibited distribution of UHMWPE products more than four years after their manufacture, although the scope of this aspect of the policy is unclear.[7]

In order to implement this five year rule, Howmedica created a computer program, known as the SPCS or Poly Filter File, to track UHMWPE products and ensure that they were not shipped after they expired.[8] Although the SPCS was primarily responsible for tracking UHMWPE products, some Pfizer warehouse employees testified that they were supposed to check the labels of devices and manually remove those that had been manufactured more than five years earlier.[9]

In late 1996 or early 1997, Howmedica decided to sell the DUK in the United

---

1. A condyle is a rounded projection on a bone. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 391 (29th ed.2000).

2. Second Amended Pretrial Order ("PTO"), Ex. 3 ¶¶ 15, 17.

3. *Id.* ¶¶ 16–17.

4. Updike Aff., Ex. 9, Diemer Kashuba Dep. 130; Ex. 12, Staub Dep. 27–28; Silverstein Cert., Nov. 29, 2003 ("Silverstein Cert. II"), Ex. 48, Crowe Cert. ¶ 3.

5. Plaintiffs' 56.1 St. in Support of Summary Judgment ("Pl. 56.1 St.") ¶ 46; Silverstein Cert. II, Ex. 19, Burstein Dep. 46–47. In this and other instances in which the Court cites the plaintiffs' Rule 56.1 statement, so much of the relevant paragraph as is referred to is admitted either explicitly or by objecting only to other parts of the relevant paragraph.

6. Silverstein Cert. II, Ex. 9.

7. *Id. Compare* Silverstein Cert. II, Ex. 50, Van Syckle Dep. 11 ("My understanding of the policy was that product was not to be distributed from Rutherford to customers after four years-post four years sterilization.") *with* Updike Aff., Ex. 9, Diemer Kashuba Dep. 50 (responding to a question about the four year date, explaining: "We would ship the product if it was to be used immediately. It had a five-year shelf life.").

8. Updike Aff., Ex. 13, O'Connor Dep. 14, 24–25; Defendants' Corrected Local Rule 56.1 Counter–Statement of Material Fact ("Def. 56.1 Counter–St.") ¶ 78.

9. Silverstein Cert. II, Ex. 39, Ward Dep., 29–31; Ex. 62, Barthol Cert. ¶ 4.

States and put together a team to launch the product and repackage the tibial components. As part of this effort, the team redesigned the label to indicate the date on which the components were manufactured.[10] Certain members of the Howmedica team had concerns about marketing the DUK so close to the time at which it no longer could be implanted.[11] For example, Paul Amregian, a packaging engineer for Howmedica, expressed concerned that the product was being released too close to the date after which it no longer should have been distributed.[12] Other employees expressed concerns about the timing of the release as well, specifically with regard to the Pfizer policy that UHMWPE products not be distributed more than four years after being manufactured.[13] In any event, Howmedica began to market the products in May of 1997 and reordered new products from Ireland for sale after the tibial components manufactured in 1993 were too old to be used.[14]

None of the DUK components manufactured in 1993 was entered into the SPCS.[15] In a memo dated March 11, 1997, Robert Blair Harvey, then manager of regulatory compliance at Howmedica, requested that Douglas O'Connor, a Howmedica employee who worked on the development of the SPCS,[16] enter the catalog numbers of the DUK products into the SPCS.[17] Mr. Harvey never followed up on this request and Mr. O'Connor cannot recall receiving such a request, although he has no reason to suspect that he did not.[18] Mr. O'Connor testified that he did not know why the DUKs were never entered into the system and surmised that it was an oversight.[19] Similarly, Elizabeth Staub, an employee of Howmedica Osteonics Corporation, testified, on the basis of corporate documents she had reviewed, that she could find no reason why the DUKs would have been excluded from the tracking system.[20] Although Mr. O'Connor testified that the system had been tested thoroughly, he acknowledged that it was limited in scope and, at the time in question, did not include products manufactured outside the United States.[21]

The first DUK tibial components were sold in the United States in or around May of 1997.[22] The tibial components continued to be sold and implanted in patients

10. Updike Reply Aff., Ex. 26, Amregian Dep. 52. All the components were given a uniform manufacture date of May 1993. *See* PTO, Ex. 3 ¶ 19.

11. Pfizer asserts that these are sham affidavits which contradict the employees' previous testimony. *See* Reply Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment ("Pl. Reply") 17–18. On summary judgment, however, all questions of credibility are resolved in favor of the nonmoving party.

12. Silverstein Cert. II, Ex. 47, Amregian Cert. ¶ 5; Ex. 52, Varley Dep., 226–27.

13. *Id.,* Ex. 48, Crowe Cert.¶ 5.

14. Updike Aff., Ex. 9, Diemer Kashuba Dep. 130, 138–39; Ex. 10; Silverstein Cert. II, Ex. 50, Van Syckle Dep. 15–16.

15. Pl. 56.1 St. ¶ 56.

16. Updike Aff., Ex. 13, O'Connor Dep. 14.

17. Silverstein Cert. II, Ex. 53.

18. Updike Aff., Ex. 13, O'Connor Dep. 44–45; Ex. 15, O'Connor Dep. 31–32.

19. Updike Aff., Ex. 13, O'Connor Dep. 54–55, 57, 61.

20. *Id.,* Ex. 12, Staub Dep. 41–42.

21. Silverstein Cert. II, Ex. 14, O'Connor Dep. 54–55; Ex. 55, Irwin Cert., Ex. A.

22. Pl. 56.1 St. ¶ 47; Updike Aff, Ex. 9, Diemer Kashuba Dep. 130; Def. 56.1 Counter–St. ¶ 47.

until sometime in early 2000.[23] It is undisputed that some of the DUKs were sold and implanted more than five years after they had been manufactured and sterilized.[24]

## B. The Purchase Agreement

On August 13, 1998, Pfizer and Stryker entered into a written stock and asset purchase agreement pursuant to which Stryker bought Pfizer's specialty trauma and prosthetic joint business, which primarily took the form of the Howmedica Corporation.[25] On December 4, 1998, the deal closed and Howmedica changed its name to MTG Divestitures, Inc. The new business was incorporated into Stryker as the Howmedica Osteonics Corp. ("HOC").[26] Approximately 2,000 of the DUK tibial components that had been manufactured in Ireland in 1993 were transferred to Stryker as part of the sale.[27]

### 1. Liability for Third Party Claims

The Purchase Agreement contains several provisions relating to the parties' liability for third party claims arising from the sale of medical devices. Section 2.5 provides:

"*Assumption of Certain Obligations of the Business.* Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the Closing, to assume all Liabilities of the Seller Corporations to the extent relating to the Conveyed Assets or the Business and to cause the Conveyed Subsidiaries and their Subsidiaries to satisfy and discharge their respective Liabilities whether arising on, prior to or after the Closing Date, and whether accrued or fixed, known or unknown, absolute or contingent, matured or unmatured or determined or determinable as of the Closing Date, other than Retained Liabilities (all of the foregoing liabilities and obligations being herein collectively called the 'Assumed Liabilities'). Except for Liabilities expressly within the definition of Retained Liabilities or as otherwise provided in this Agreement, Assumed Liabilities shall include, without limitation, the following:

(a) except as provided in Section 2.6(g), all lawsuits commenced and claims made after the Closing Date to the extent resulting from the conduct of the Business or the ownership of the Shares or the Conveyed Assets prior to, on or after the Closing Date;

\* \* \* \* \* \*

(c) all Liabilities resulting from a claim by a third party for money or other compensation (beyond the cost of a particular product) in respect of injury allegedly due and owing as a result of the use or application of a product of the Business sold after the Closing Date, including, without limitation, warranty obligations and irrespective of legal theory asserted."[28]

Section 2.6 of the Purchase Agreement defined the Retained Liabilities of the Business for which Pfizer remains liable:

"Notwithstanding any provision in this Agreement, the Seller Corporations

**23.** Updike Aff., Ex. 18, HOC's Response to Diane Kitchens' First Set of Interrogatories, *Bartlett v. Stryker Corp.*(No. 03–534–A) at 6.

**24.** The precise number is disputed. Pl. 56.1 St. ¶ 52; Def. 56.1 Counter–St. ¶ 52.

**25.** PTO, Ex. 3 ¶ 11.

**26.** *Id.* ¶¶ 2,7, 13.

**27.** Pl. 56.1 St. ¶ 42;

**28.** Updike Aff., Ex. 1, Reid Decl., Ex. A (hereinafter Purchase Agreement) § 2.5, at 35.

shall retain and be responsible for the following (the 'Retained Liabilities'):

\* \* \* \* \* \*

"(c) Liabilities for which any Seller Corporation expressly has responsibility pursuant to the terms of this Agreement;

\* \* \* \* \* \*

"(g) Liabilities resulting from a claim by a third party for money or other compensation (beyond the cost of a particular product) in respect of injury allegedly due and owing as a result of the use or application of a product of the Business sold on or prior to the Closing Date, including, without limitation, warranty obligations and irrespective of the legal theory asserted." [29]

### 2. *Indemnification*

The parties agreed also to indemnify each other in certain circumstances. Section 8.1 provides for indemnification by Pfizer:

"Pfizer agrees to defend, indemnify and hold harmless Purchaser and its Affiliates, and, if applicable, their respective directors, officers, agents, employees, successors and assigns from and against any and all claims, actions, causes of action, judgments, awards, liabilities, losses, costs or damages (collectively, a 'Loss' or, the 'Losses') claimed or arising directly from (i) any Retained Liability, . . . (iii) any breach by the Seller Corporations of any of its covenants or agreements contained in this Agreement or in any agreement, (iv) any breach of any representation and warranty of the Sell-

er Corporations contained in this Agreement, it being understood that for purposes of this Article VIII, all materiality exceptions and qualifications set forth in any representation and warranty of Pfizer contained in this Agreement shall be disregarded, the materiality standard for Pfizer's obligations to indemnify Purchaser and its Affiliates, . . . in respect of a breach of a representation and warranty contained herein being set forth in Section 8.6 hereof." [30]

Section 8.2 similarly provides for Stryker to defend, indemnify and hold harmless Pfizer against any and all Losses arising from, *inter alia,* "any Assumed Liability" and events occurring after the Closing Date.[31]

The materiality provision in Section 8.6 of the Agreement provides that neither party shall have any obligation to indemnify the other under either Section 8.1(a)(iv) or Section 8.2(a)(iii) for Losses, net of insurance:

"unless the aggregate of all such Losses for which either party would, but for this provision, be liable exceeds on a cumulative basis $17,500,000, but if such amount is exceeded, such party shall be required to pay only the amount of such Losses which in the aggregate exceed $17,500.000." [32]

Significantly, the parties agreed also to certain procedures for claiming indemnification with respect to third party lawsuits. Section 8.3 requires the party seeking indemnification to give notice of the claim and tender the defense of such action or suit.[33] Section 8.4 gives the indemnifying

**29.** *Id.* § 2.6, at 36–37.

**30.** *Id.* § 8.1(a), at 126–27.

**31.** *Id.* § 8.2(a), at 128.

**32.** *Id.* § 8.6, at 133.

**33.** The notice and tender provision reads as follows:
"The Indemnified Party shall promptly notify the Indemnifying Party of such action or suit and tender the Indemnified Party [sic] the defense of such action or suit. A failure to give notice and to tender the defense of

party the right, "but not the obligation, to conduct and control, through counsel of its choosing, any third party claim, action or suit." [34] It provides further that "[n]o Indemnified Party may compromise or settle any Third Party Claim for which it is seeking indemnification hereunder without the consent of the Indemnifying Party." [35]

## C. The Transitional Services Agreement

The parties entered also into a Transitional Services Agreement (the "TSA") pursuant to which Stryker purchased from Pfizer services and the right to use necessary facilities so that the business at issue could continue to operate without interruption [36] during the period between the closing on December 4, 1998 and, so far as relevant here, December 31, 1999.[37] In performing those services, Pfizer "represent[ed] and warrant[ed] that they [would] . . . perform the services . . . hereunder in a competent, businesslike manner." [38]

The TSA contains its own liability and remedy provision. It limits liabilities for breach to the greater of "(i) a refund of price paid for the particular Service or (ii) Buyer's incremental cost of performing the Service itself or (iii) Buyer's incremental cost of obtaining the Service from a third party." [39] In addition, it provides:

> the action or suit in a timely manner pursuant to this Section 8.3 shall not limit the obligation of the responsible Person under this Article VIII, except (i) to the extent such Indemnifying Party is prejudiced thereby; [and] (ii) except to the extent expenses are incurred during the period in which notices was not provided." *Id.* § 8.3 at 129–30.

34. *Id.* § 8.4(a), at 130.

35. *Id.* at 130–31.

36. Updike Aff., Ex. 1, Reid Decl., Ex. B, TSA.

37. *Id.* § 3.1.

38. *Id.* § 6.1.

"Notwithstanding anything to the contrary herein, in no event shall Pfizer have any liability for loss of profit, diminution in value, loss of goodwill or consequential, incidental or punitive or other special damages as a result of provision of or failure to provide the services under the terms of this Agreement." [40]

## D. The DUK Third Party Litigation

Beginning in late 2000, a series of products liability suits relating to the DUKs were brought against Pfizer, Stryker and HOC. The plaintiffs generally alleged that they received one or more UHMWPE tibial components that had been manufactured and sterilized more than five years prior to implantation.[41] On November 30, 2000, Stryker tendered the defense of all claims, whether they arose from products sold before or after December 4, 1998, to Pfizer.[42] Pfizer in turn tendered the defense of all claims arising from products sold after the closing to Stryker, which refused to assume the defense.[43] Pfizer asserts that it accepted Stryker's tender with respect to the claims relating to pre-closing sales,[44] although Stryker maintains that its counsel obtained its dismissal from several pre-closing actions.[45] It is undisputed that Pfizer provided counsel to defend Stryker in at least two suits and that the parties

39. *Id.* § 6.2.

40. *Id.*

41. Updike Aff., Ex. 3, Bernstein Decl. ¶ 12.

42. Pl. 56.1 St. ¶ 51; Silverstein Cert. II, Ex. 4, Hall Cert. ¶ 12, Ex. A.

43. Updike Aff., Ex. 3, Bernstein Decl. ¶ 4; Silverstein Cert. II, Ex. 4, Hall Cert., Exs. F, I, K.

44. Updike Aff., Ex. 3, Bernstein Decl. ¶¶ 4, 15.

45. Silverstein Cert. II, Ex. 16, Routh Cert. ¶¶ 1–3.

cooperated in several of the DUK cases pursuant to a joint defense agreement.[46]

One of the largest suits, entitled *Orrick v. Stryker Corp.*, was a consolidation of approximately forty cases; including eleven pre-closing and twenty-nine post-closing cases.[47] Stryker there stipulated that the devices it sold were defective, that the defects proximately caused the plaintiffs' injuries, and that it was liable to the plaintiffs for breach of implied warranty of merchantability.[48] Stryker's counsel in the *Orrick* litigation informed Pfizer of its discussions with opposing counsel and provided Pfizer's counsel with a draft of the proposed stipulation, though the timing of this occurrence is disputed.[49] Stryker then obtained a voluntary dismissal from all forty *Orrick* cases. In 2002, Pfizer settled with the *Orrick* plaintiffs, including those whose cases arose from DUKs sold after the closing.[50]

The parties subsequently have been subjects of other suits involving old DUKs and now seek to resolve their rights to indemnification for their losses under the Purchase Agreement.

## II

### A. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[51] The moving party has the burden of demonstrating the absence of a genuine issue of material fact[52] and the Court must view the facts in the light most favorable to the nonmoving party.[53] Where, as here, there are cross motions for summary judgment, a court need not "grant judgment as a matter of law for one side or the other," but "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."[54]

### B. *The Parties' Claims*

Pfizer here seeks (1) a declaration that Stryker is obliged (a) to defend, indemnify and hold it harmless for any and all claims and actions arising as a result of any injury caused by the use of a product of the business sold after the closing date; (b) reimburse Pfizer for any and all litigation expenses accrued for products sold after the closing date; (c) reimburse Pfizer for all judgments, awards, liabilities or settlements it is obligated to pay as a result of any third party claims for any injury allegedly due to the use of a product sold after

46. *Id.* ¶ 5; *see also Pfizer v. Stryker*, 02 Civ. 8613(LAK), 2003 WL 21660339 (S.D.N.Y. July 15, 2003). Stryker asserts that although counsel was provided it was conflicted.

47. Pl. 56.1 St. ¶ 61.

48. *Id.* ¶ 62; Def. 56.1 Counter–St. ¶¶ 61–62; Silverstein Cert. II, Ex. 16, Routh Cert. ¶¶ 3–4.

49. Silverstein Cert. II, Ex. 16, Routh Cert. ¶ 7; Updike Reply Aff., Ex. 21, Barnes Decl. ¶¶ 3–4, Ex. 1.

50. Pl. 56.1 St. ¶ 63.

51. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir.2000).

52. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

53. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir.1997).

54. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993) (quoting *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 313–14 (2d Cir.1981) (internal citations omitted)).

the closing date; and (d) reimburse Pfizer for all attorney's fees and litigation expenses in connection with its effort to enforce its rights to indemnification in this declaratory judgment action;[55] (2) damages for breach of contract as a result of Stryker's failure to indemnify and hold it harmless against claims arising from post-closing sales of the DUK;[56] and (3) summary judgment dismissing Stryker's counterclaims for a declaratory judgment, indemnification, breach of contract, and fraud.[57]

Stryker seeks summary judgment requiring Pfizer to indemnify it for all losses it has suffered as a result of the expired DUKs, which it asserts flow from Pfizer's breach of its representation and warranty in Section 5.9 of the Purchase Agreement, and dismissing Pfizer's amended complaint.[58]

### C. *Declaratory Judgment Action*

The parties advance competing interpretations of the Purchase Agreement in support of their conflicting views of their respective obligations with respect to third party claims relating to DUKs. As both seek summary judgment on their claims for relief, it is convenient to discuss the issue in one place.

#### 1. *Indemnity for Third Party Claims*

Each party asserts that the other must indemnify it for all losses arising from DUKs sold after December 4, 1998. Stryker claims that it is entitled to indemnification by Pfizer as to all losses relating to DUKs, whenever sold, and that in defending against third party claims, it is entitled to attorneys of its own choosing, with costs borne by Pfizer.[59]

Pfizer's argument is simple: Stryker is obliged by Sections 2.5, 2.6(g) and 8.1 to indemnify Pfizer against any loss incurred as a result of DUKs sold after the closing date. It maintains that it is entitled to summary judgment for declaratory relief to that effect.[60]

Stryker's position is more complex. It begins by arguing that Pfizer shipped old DUKs prior to the closing and during the transition period and thus breached covenants and warranties contained in Sections 5.9(a), 7.2 and 7.18. At least some of the

---

**55.** Plaintiffs' Amended Complaint ("Am. Cpt.") 12.

**56.** *Id.* at 13.

**57.** Pfizer's Memorandum of Law in Support of Partial Summary Judgment ("Pl. Mem.") 14–15, 19–20.

**58.** Stryker's Memorandum of Law in Support of Defendants'/Counterclaimants Motion for Summary Judgment ("Def. Mem.") 3–4, 7.

**59.** In its counterclaim, Stryker seeks a declaratory judgment concerning:

"(1) Whether Pfizer is obligated ... to defend and indemnify defendants as to all existing and future Losses and Liabilities, regardless of whether those Losses relate to expired DUKs sold before, on, or after the date of the Closing;

"(2) Whether in defending against such Losses and Liabilities, counterclaimants are entitled to defense by attorneys of their own choosing, whose reasonable fees are to be paid by Pfizer;

"(3) Whether counterclaimants are obligated to indemnify Pfizer as to any existing or future Losses relating to Expired DUKs sold after the date of Closing;

"(4) Whether New York law bars [Pfizer's] recovery from counterclaimants of indemnification for losses suffered by [Pfizer] as a result of [its] own intentional causation of injury to third parties, for punitive damages awarded against [Pfizer], and for payments made by [Pfizer] in settlement of claims for such damages or for such causation of injury." Amended Counterclaim for Declaratory Judgment and Damages ("Am. Counterclaim") 29.

**60.** Pl. Mem. 13.

post-closing claims for which Pfizer seeks indemnification allegedly arose out of the implantation of outdated DUKs. These, in Stryker's view, therefore are Retained Liabilities—claims for which Pfizer retained responsibility under Section 2.6(c). Stryker then argues that the phrase "[n]otwithstanding any provision in this Agreement" at the outset of Section 2.6 overrides Sections 2.5(c) and 8.2, which in its absence would have made Stryker responsible for claims with respect to DUKs sold after the closing.[61] Accordingly, Stryker argues, Pfizer is obligated to defend and indemnify Stryker on these claims, as well as with respect to claims based on DUKs sold before the closing.[62]

Pfizer counters by arguing that Stryker misreads the agreement which, in its view, unambiguously makes Stryker responsible for all post-closing claims. While Pfizer acknowledges that it could be liable for a breach of covenant or warranty related to the DUKs, its liability would be subject to the $17.5 million materiality threshold contained in the Purchase Agreement.

Under New York law,[63] the interpretation of an unambiguous contract is a question of law for the court.[64] When an agreement is ambiguous, however, its meaning is a question of fact. Whether a contract is unambiguous is a threshold question.[65] The existence of an ambiguity depends on whether there is a reasonable basis for difference of opinion as to the meaning of the contract.[66] A contractual provision is not ambiguous merely because the parties urge different interpretations of it.[67] Summary judgment is appropriate if the contract is unambiguous or if the language is ambiguous but there is relevant extrinsic evidence that creates no genuine issue of fact and permits interpretation of the agreement as a matter of law.[68]

Section 2.5 of the Purchase Agreement assigns liability to Stryker, except as otherwise provided in Section 2.6(g), for "all lawsuits commenced and claims made after the Closing Date to the extent resulting from the conduct of the Business or the ownership of the Shares or the Conveyed Assets prior to, on or after

---

61. Defendants' Corrected Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Def. Opp. Mem.") 4–5.

62. *Id.*

63. The law of the forum state governs where, as here, there is no allegation that the law of a different state would control. *See Questrom v. Federated Dep't Stores, Inc.*, 192 F.R.D. 128, 133 n. 26 (S.D.N.Y.2000), *aff'd*, 2 Fed.Appx. 81 (2d Cir.2001). Moreover, the Purchase Agreement specifies that it is governed by New York law and New York's choice of law rules would uphold that designation. *See* N.Y. GEN. OBLIG. LAW § 5–1401 (McKinney 2001); *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non–Ferrous Metals Trading Co.* 179 F.Supp.2d 118, 138 (S.D.N.Y.2000).

64. *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir.2002); *Kass v. Kass*, 91 N.Y.2d 554, 566–67, 673 N.Y.S.2d 350, 357, 696 N.E.2d 174 (1998).

65. *Int'l Multifoods Corp.*, 309 F.3d at 83; *see Mallad Const. Corp. v. County Federal Sav. & Loan Ass'n.*, 32 N.Y.2d 285, 291, 344 N.Y.S.2d 925, 930, 298 N.E.2d 96 (1973) ("[W]here a question of intention is determinable by written agreements, the question is one of law.").

66. *Morgan Stanley Group, Inc. v. New England Ins. Co.*, 225 F.3d 270, 275–76 (2000); *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir.1998).

67. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992).

68. *Mellon Bank, N.A. v. United Bank Corp.*, 31 F.3d 113, 116 (2d Cir.1994).

the Closing Date" and for liabilities result-
ing from products sold after the closing
date.[69] Section 2.6(g) assigns responsibili-
ty to Pfizer for all claims arising from
products sold on or prior to the closing.
Hence, the Agreement plainly and unam-
biguously makes Stryker responsible for
all third party claims in respect of prod-
ucts sold after the closing.

Stryker's alternative interpretation of
the Agreement is unpersuasive. Its start-
ing premise is that post-closing third party
products liability claims are Retained Lia-
bilities within the meaning of the Purchase
Agreement because they arose out of the
implantation of outdated DUKs and there-
fore out of breaches by Pfizer of covenants
and warranties for which Pfizer is obliged
to indemnify Stryker. But this premise is
the product of a tortuous reading of the
contract that cannot be squared with its
plain language.

To begin with, the Retained Liabilities
are those liabilities *of the business sold to
Stryker* that were not to be assumed by
Stryker, but kept by Pfizer. Any liabili-
ties that might have arisen out of breach
by Pfizer of covenants and warranties giv-
en in the Purchase Agreement, however,
are not liabilities of the business sold.
Indeed, they are liabilities that did not
even exist when Pfizer owned the busi-
ness and thus liabilities incapable of being
retained.[70] While they are liabilities of
Pfizer, to be sure, they are not Retained
Liabilities within the meaning of the
Agreement. That being so, the preambu-
lary language in Section 2.6—the phrase
"[n]otwithstanding any provision in this

Agreement"—cannot make Pfizer respon-
sible for defending and indemnifying
Stryker on third party claims arising out
of post-closing DUKs sales through the
medium of Section 2.6(c).

This view is confirmed by the overall
structure of the Purchase Agreement.
Sections 2.5 and 2.6 allocate liability be-
tween Pfizer and Stryker based upon the
dates of claims brought and, in the case of
third party product liability suits, the
dates of when the products were sold. To
interpret Retained Liability to include all
potential breaches in a manner that would
make Pfizer responsible for all losses aris-
ing from DUKs—whether sold before, on,
or after the closing date—would be at odds
with this careful allocation of liability.

Stryker disputes this interpretation, re-
lying on *International Multifoods Corp. v.
Commercial Union Insurance Co.*[71] for the
proposition that Section 2.6(c), which re-
quires Pfizer to retain and be responsible
for liabilities for which it is responsible
under the Agreement, overrides Section
2.5(c).[72] But this argument is unconvinc-
ing.

In *International Multifoods*, the Second
Circuit considered whether an insurance
policy that plaintiff had obtained from the
Indemnity Insurance Company of North
America ("IINA") covered its losses from
a cargo of frozen poultry and meat prod-
ucts that had been seized by Russian au-
thorities.[73] The policy contained a free-of-
capture-or-seizure ("FC & S") clause,
which provided that, "[n]otwithstanding
anything herein contained to the contrary

---

**69.** Purchase Agreement §§ 2.5(a), (c), at 35.

**70.** The dictionary definitions of "retain" are:
"To maintain possession of," and "to keep or
hold in a particular place, condition, or posi-
tion," and "To keep in mind." THE AMERICAN
HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE
1487 (4th ed., 2000).

**71.** 309 F.3d 76 (2d Cir.2002).

**72.** Def. Opp. Mem. 4–5.

**73.** *Int'l Multifoods Corp.*, 309 F.3d at 80–81.

this insurance is warranted free from ... capture, seizure, arrest, restraint ... and the consequences thereof ... whether in time of peace or war and whether lawful or otherwise."[74] The other insurer in the case, who sought contribution from IINA, argued that this FC & S clause was limited by another section of the contract, which provided that "all goods and/or merchandise shipped, except as may be hereinafter especially provided, are insured ... against all risks of physical loss or damage from any external cause (excepting risks excluded by the FC & S ... warranty unless covered elsewhere herein)."[75] The Second Circuit held that "because the FC & S clause alone among relevant provisions applie[d] notwithstanding anything else in the contract" it overrode "any inconsistent language elsewhere in the IINA policy."[76]

The provisions of the Purchase Agreement differ from those at issue in *International Multifoods.* Section 2.6(c) is not inconsistent with the allocation of responsibility for third party suits provided in Sections 2.5(c) and 2.6(g). Rather, the Purchase Agreement creates different types of liabilities, each with its own remedy. Accordingly, Pfizer's responsibility for its Retained Liabilities and Stryker's liability for claims for products sold after the closing are not inconsistent with one another and each clause therefore may be given force.

## 2. Is the Indemnification Agreement Enforceable?

■ Stryker next argues, notwithstanding the allocation of liability in the contract, that this aspect of the Purchase Agreement is unenforceable because all of Pfizer's losses from the post-closing cases are a direct result of Pfizer's intentional actions in selling the DUKs more than five years after their manufacture.[77] It relies on the principle that indemnification agreements that "purport to indemnify a party for damages flowing from the intentional causation of injury" are unenforceable as against public policy.[78] In this regard, it is important to bear in mind that the requisite intent is a party's intent to cause injury.[79] Indemnification agreements are enforceable where the damages are due to a party's grossly negligent, but not willful or intentional, conduct.[80]

■ Stryker would have the burden of proving at trial that Pfizer intentionally caused the damages for which it seeks indemnification. In moving for summary judgment, it therefore is sufficient for Pfizer to point to a lack of evidence to go to the trier of fact on an essential element of Stryker's claim.[81] It asserts that there is no evidence to support Stryker's contention. Accordingly, Stryker may avoid summary judgment only if the evidence, construed in its favor, would permit a trier of fact reasonably to find for it on this issue.

74. *Id.* at 90 (emphasis omitted).

75. *Id.* (emphasis omitted).

76. *Id.* at 91.

77. Am. Counterclaim ¶ 124.

78. *Austro v. Niagara Mohawk Power Corp.,* 66 N.Y.2d 674, 676, 496 N.Y.S.2d 410, 410, 487 N.E.2d 267 (1985).

79. *See Bank of New York v. Neumann,* 216 A.D.2d 189, 190, 628 N.Y.S.2d 675, 676 (1st

Dep't 1995) (for public policy defense, the threshold question is whether there was "a personal intent to injure the plaintiff").

80. *Austro,* 66 N.Y.2d at 676, 496 N.Y.S.2d at 410, 487 N.E.2d 267.

81. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).

Stryker points to evidence that personnel at Howmedica began marketing and selling the DUK tibial components in late 1996 and 1997, only a short time before the company's four-year limit on distribution of conventionally radiation sterilized UHMWPE was reached.[82] It asserts also that the failure of numerous people to enter the DUKs into the SPCS or otherwise quarantine the products belies Pfizer's claim of inadvertence. It maintains that this failure more plausibly is explained by evidence that Pfizer sought the release of the DUK to increase its market share and provide a total knee product.[83]

Viewed in the light most favorable to the nonmoving party, Stryker's evidence suggests that Howmedica personnel were negligent with regard to the DUK products. It does not, however, raise any genuine issue of fact that Pfizer distributed the DUKs with the intent to cause injury or intentionally distributed them with a reckless disregard for the consequences. Consequently, public policy does not forbid Pfizer's enforcement of its right to indemnity for losses resulting from DUKs sold after the closing.

### 3. *Punitive Damages*

■ Stryker seeks also a declaration that even if the indemnity agreement is otherwise enforceable, it is not required to indemnify Pfizer for any punitive dam-

ages.[84] New York prohibits indemnification for punitive damages as against public policy.[85] Pfizer therefore is not entitled to indemnification for any losses from post-closing cases resulting from a punitive damage award.

### 4. *Attorney's Fees*

■ As the prevailing party, Pfizer seeks a declaration that Stryker is obliged to reimburse it for its attorney's fees incurred in this action to enforce its right to indemnity for Losses from post-closing DUKs under the Purchase Agreement.

Attorney's fees are incidents of litigation. Pfizer therefore may recover them here only if the Purchase Agreement expressly provides for indemnification for costs of litigation between the parties.[86] The standard for determining if such a promise exists is whether there is an "unmistakably clear" intent to indemnify, either from the language or the structure of the agreement.[87]

Section 8.2 of the Purchase Agreement provides that Stryker is obliged to indemnify Pfizer as to:

"any and all Loss claimed or arising directly from (i) any Assumed Liability, (ii) any breach by [Stryker] of any of its covenants or agreements in this Agreement, (iii) any breach of any warranty or

---

**82.** Def. Opp. Mem. 24–25.

**83.** *Id.;* Def. 56.1 Counter–St. ¶¶ 95–96; Silverstein Cert. II, Exs. 40–41.

**84.** Am. Counterclaim 29.

**85.** *See Biondi v. Beekman Hill House Apt. Corp.,* 94 N.Y.2d 659, 709 N.Y.S.2d 861, 731 N.E.2d 577 (2000); *Home Ins. Co. v. Am. Home Prods. Corp.,* 75 N.Y.2d 196, 201, 551 N.Y.S.2d 481, 484, 550 N.E.2d 930 (1990); *Hartford Acc. & Indem. Co. v. Village of Hempstead,* 48 N.Y.2d 218, 228, 422 N.Y.S.2d 47, 53, 397 N.E.2d 737 (1979).

**86.** *Hooper Assocs. v. AGS Computers,* 74 N.Y.2d 487, 491–92, 549 N.Y.S.2d 365, 367, 548 N.E.2d 903, 905 (1989); *see also Mighty Midgets, Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12, 21, 416 N.Y.S.2d 559, 564, 389 N.E.2d 1080 (1979).

**87.** *Hooper Assocs.,* 74 N.Y.2d at 492, 549 N.Y.S.2d at 367, 548 N.E.2d 903; *Haynes v. Kleinewefers,* 921 F.2d 453, 456 (2d Cir.1990) (citing cases).

representation of Purchaser contained in this Agreement, or (iv) events occurring on or after the Closing Date in connection with the Business (other than the Excluded Assets and the Retained Liabilities)." [88]

The Agreement creates a notice of claim procedure, which sets forth a general mechanism for enforcing claims as well as special provisions when a party seeks indemnification as a result of a third party suit.[89] Section 8.4 further specifies rights and obligations for indemnification for third party claims and provides that the indemnifying party shall have the right to conduct and control any third party claim.[90] It provides also that the indemnified party may employ counsel at its own expense to defend against a third party suit.[91]

Here, the Purchase Agreement's provision for indemnification by Stryker for a breach of warranty or representation suggests that the indemnification clause refers both to inter-party and third party claims. As a court in this district noted in its interpretation of a similar agreement, "[i]t is difficult to imagine a third-party action as a result of" the indemnifying party's misrepresentation.[92] Since the Agreement provides indemnity for a party's costs, this may be read as an intent to cover attorney's fees in the case of inter-party claims.

The structure of the Purchase Agreement evinces also their intent to indemnify for costs relating to inter-party claims. The provisions treating third party claims would be surplusage if Section 8.2 did not refer also to claims between the parties themselves.[93] As the intent to provide such indemnification is "clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances," Pfizer is entitled to indemnification for its reasonable attorney's fees in prosecuting the declaratory judgment action.[94]

### D. Pfizer's Motion for Summary Judgment

#### 1. On Pfizer's Breach of Contract Claim

Pfizer asserts that it is entitled to summary judgment on count two of its amended complaint, which charges Stryker with breach of contract for its failure to indemnify and hold it harmless with respect to litigation relating to DUKs sold after the closing date.[95]

A plaintiff must prove four elements to prevail on a breach of contract claim: (1) the making of a contract, (2) plaintiff's performance, (3) defendant's breach, and (4) damages.[96] It is undisputed that Pfizer notified Stryker of its claims for indemnification and formally tendered the defense of those suits to Stryker.[97]

88. Purchase Agreement § 8.2(a), at 128.

89. Id. § 8.3(a), at 129.

90. Id. § 8.4(a), at 130.

91. Id. at 131.

92. Promuto v. Waste Mgmt., Inc., 44 F.Supp.2d 628, 652 (S.D.N.Y.1999).

93. See Breed, Abbott & Morgan v. Hulko, 139 A.D.2d 71, 73, 531 N.Y.S.2d 240, 241 (1st Dep't 1988), aff'd, 74 N.Y.2d 686, 543 N.Y.S.2d 373, 541 N.E.2d 402 (1989).

94. Hooper Assocs., 74 N.Y.2d at 491–92, 549 N.Y.S.2d at 367, 548 N.E.2d 903.

95. Am. Cpt. ¶¶ 29–37.

96. Coastal Aviation v. Commander Aircraft Co., 937 F.Supp. 1051, 1060 (S.D.N.Y.1996), aff'd, 108 F.3d 1369, 1997 WL 138112 (2d Cir.1997) (table); 22A N.Y. Jur.2d, Contracts § 432 (2003).

97. Pl. 56.1 St. ¶ 51; Silverstein Cert. II, Ex. 4, Hall Cert., Exs. F–K.

Stryker refused Pfizer's tender and rejected claims for indemnification for post-closing suits.[98] Hence, Stryker is liable for breach of contract unless it is excused from indemnifying Pfizer for the post-closing cases.

Stryker first contends that its failure to indemnify Pfizer with respect to the pre-closing claims is excused because Pfizer breached first. It asserts that Pfizer did not fully accept its tender of defense and that Stryker's lawyers were responsible for having it dismissed from the pre-closing cases in *Orrick v. Stryker Corp.*[99]

■ Even assuming that Pfizer wrongfully declined to defend Stryker for all pre-closing claims, such a breach would not excuse Stryker's failure to perform its indemnification obligation. Where an indemnifying party is notified of a claim and improperly declines to defend it, the remedy for such a breach is generally that the indemnitor must reimburse the indemnitee for the cost of defending the action [100] as well as for the judgment or any settlement to the extent that it was reasonable and entered into in good faith.[101] Accordingly, Pfizer's alleged failure to defend Stryker does not raise a genuine issue of fact that Stryker is excused from performing its defense and indemnification obligation under the Agreement.[102]

■ Stryker claims also that its breach is excused on the theory that Pfizer breached its obligations in Sections 5.9(a), 7.2, and 7.18 of the Purchase Agreement.[103] Stryker's failure to perform may be excused only if its indemnification obligation is dependent upon Pfizer's performance of Sections 5.9(a), 7.2 and 7.18.[104] "[T]he question whether covenants are to be held dependent or independent of each other is to be determined by the intention and meaning of the parties, as expressed by them, and by the application of common sense." [105] If two promises are independent, breach of one does not excuse performance of the other.

98. Silverstein Cert. II, Ex. 4, Hall Cert., Ex. B.

99. Def. Opp. Mem. 6.

100. *GRE Ins. Group v. GMA Accessories, Inc.,* 180 Misc.2d 927, 932, 691 N.Y.S.2d 244, 248 (N.Y.Sup.Ct.1998).

101. *CIGNA, Corp. v. Lincoln Nat'l Corp.,* 6 A.D.3d 298, 299, 775 N.Y.S.2d 303, 304 (1st Dep't 2004); *Baker v. Northeastern Indus. Park,* 73 A.D.2d 753, 754, 423 N.Y.S.2d 308, 311 (3d Dep't 1979).

102. Moreover, the evidence Stryker raises does not suggest that Pfizer wrongfully declined to accept Stryker's tender. Section 8.4 of the Purchase Agreement provides that the indemnifying party "shall have the right, but not the obligation, to conduct and control, through counsel of its choosing, any third party claim, action or suit." Purchase Agreement § 8.4(a), at 130. The party seeking indemnification may also participate in the defense of an action through counsel of its own choosing, provided that "the fees and expenses of such counsel shall be borne by the Indemnified Party." *Id.* at 131. Taken together, these provisions indicate that the fact Stryker has had its own counsel work on its behalf to resolve the litigation does not suggest a breach on Pfizer's part. Rather, Stryker appears to have exercised its option under the Agreement to employ counsel of its own choosing because it was unhappy with the counsel provided by Pfizer. *See* Am. Counterclaim ¶ 54.

103. Def. Opp. Mem. 4.

104. *See Rudman v. Cowles Communications,* 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 42, 280 N.E.2d 867 (1972).

105. *Rosenthal Paper Co. v. Nat'l Folding Box & Paper Co.,* 226 N.Y. 313, 320, 123 N.E. 766 (1919); *see also Ginett v. Computer Task Group,* 962 F.2d 1085, 1098 (2d Cir.1992).

 The Purchase Agreement provides different remedies depending on the reason indemnity is sought. Sections 8.1(a)(i)-(iii) provide for full indemnity for any losses Stryker might sustain that arise directly from any Retained Liability or any breach by Pfizer of its covenants. Section 8.1(a)(iv) provides indemnity for a breach of a warranty and representation, but has a materiality provision as well, which allows indemnification only where the loss exceeds $17.5 million, net of insurance. This materiality provision does not apply where a party seeks indemnification for expenditures relating to a third party product liability claim. The parties' creation of distinct indemnification provisions for any breaches of warranties and representations, and for losses arising from third party claims, indicates that they intended the obligations to be independent.

Stryker does not point to any evidence of the parties' intent to make these provisions dependent so that Pfizer's alleged breach of warranty would relieve Stryker of further performance. Indeed, insofar as the parties expressly provided for each to indemnify the other in the case of a breach of covenant, warranty or representation, they suggested that they did not intend such a breach to excuse further performance by the non-breaching party. Pfizer's alleged breaches of the warranty and notice provisions of the Purchase Agreement therefore do not raise a genuine issue of material fact with regard to its entitlement to indemnity for losses as a result of DUKs sold after December 4, 1998.

Pfizer claims losses from post-closing DUKs, including reasonable attorney's fees and interest, in the amount of $10,971,844.77 as of September 12, 2003.[106] Stryker asserts that this is not a reasonable estimate as many of the cases upon which that figure is based have settled.[107] Accordingly, Pfizer is entitled to summary judgment with respect to liability on its breach of contract claim, with damages to be determined at trial.

2. *Dismissing Stryker's Claims for Indemnification with Respect to Pre-Closing Third Party Claims*

The first three counts of Stryker's counterclaim allege various breaches of the Purchase Agreement relating to the outdated DUKs. They claim that all of Stryker's losses with regard to the expired DUKs are attributable to those breaches and that Pfizer therefore should indemnify it for those losses and fully and timely defend any lawsuits arising from the expired DUKs.[108] Pfizer seeks dismissal of these claims. It argues that Stryker is barred from indemnification because it has settled claims without the permission of Pfizer, a prerequisite for indemnification under the Purchase Agreement.[109]

 Stryker's initial response is that Pfizer may not now raise the issue of failure to seek its permission to settle because it did not deny "specifically and with particularity" Stryker's allegation that it had performed all obligations under the contract as required by Rule 9(c). This need not long detain us. There would be no prejudice to Stryker in allowing Pfizer to assert this point now. The Court therefore construes Pfizer's motion for summary judgment as one seeking also to

---

**106.** Pl. 56.1 St. ¶ 65.

**107.** Def. Counter 56.1 St. ¶ 65.

**108.** Am. Counterclaim ¶¶ 62, 67, 72.

**109.** Pl. Mem. 27–28.

amend the pleadings so as to assert that Stryker failed to obtain its permission to settle claims and permits the amendment.[110]

Passing to the merits, the Purchase Agreement provides that "[n]o Indemnified Party may compromise or settle a Third Party Claim for which it is seeking indemnification hereunder without the consent of the Indemnifying Party." [111] It is undisputed that Stryker settled at least some of the relevant claims without the express approval of Pfizer. Stryker, however, contends that Pfizer implicitly consented to the settlements. It points to evidence that it notified Pfizer of its intention to settle the claims, furnished its counsel with a draft of the stipulation of liability in the *Orrick* litigation, and that Pfizer offered no objection.[112] Pfizer for its part contends that it was not informed of the stipulation before Stryker entered into it and that the established course of dealings between the parties was to seek explicit consent.[113]

In all the circumstances, there is a genuine issue of material fact as to whether Pfizer consented to the settlements. Pfizer's motion for summary judgment dismissing the first three counts of Stryker's counterclaim therefore must be denied.

### 3. Dismissing Stryker's Claim for Losses Attributable to Breach of Warranty and Misrepresentation

Count five of Stryker's amended counterclaim seeks indemnification for Pfizer's alleged breach of the warranty in Section 5.9(a) that "each Seller Corporation and each Conveyed Subsidiary . . . is in compliance with all Laws applicable to the ownership or operation of its assets or the Business, except to the extent that the failure to comply therewith would not have a Material Adverse Effect." [114] It is based on the theory that Pfizer was not in compliance with FDA medical device regulations by reason of its shipment of the outdated DUKs. Pfizer seeks summary judgment dismissing count five to the extent that Stryker's losses fall below the $17.5 million threshold set forth in Section 8.6. It claims also that it is not obliged to indemnify Stryker until its actual losses as a result of this alleged breach exceed that amount.

Stryker first asserts that Pfizer's failure to plead specifically and with particularity that Stryker had not yet met the $17.5 million threshold for indemnity for breach of warranty precludes it from asserting that argument now. Since Pfizer asserted that Stryker has not yet suffered losses amounting to more than $17.5 million as a result of the alleged breach of warranty in

---

**110.** *See Int'l Paving Systems, Inc. v. Van–Tulco, Inc.*, 866 F.Supp. 682, 691–92 (E.D.N.Y. 1994); *Fireman's Fund Ins. Co. v. Schuster Films, Inc.*, 811 F.Supp. 978, 982 (S.D.N.Y. 1993) (plaintiff's failure to plead with particularity the defendant's lack of compliance with a condition precedent to insurance coverage did not bar litigation of the issue because both parties had notice of what issues were in dispute); *see also* 2 JAMES WM. MOORE ET. AL., MOORE'S FEDERAL PRACTICE § 9.04[3] (3d ed.2000) (denial of performance or occurrence of a condition may be made in a motion to dismiss or for summary judgment).

**111.** Purchase Agreement § 8.4(a), at 130–31.

**112.** *E.g.*, Silverstein Cert. II, Ex. 16; Routh Cert. ¶¶ 8, 11.

**113.** *See* Updike Reply Aff., Ex. 21, Barnes Decl. ¶¶ 3–4; Memorandum in Support of Motion to Separate Trial of Defendants Pfizer Inc, & MTG Divestitures, Inc. from Trial of Defendant Howmedica Osteonics Corp. at 2, *Orrick v. Stryker Corp.* (No. 191900); Letter from Barnes to Routh of 11/14/2003.

**114.** Purchase Agreement § 5.9(a), at 59. The claim is based also on the theory that the same representation was inaccurate.

the amended pretrial order, the Rule 9(c) pleading requirement has been satisfied. The Court therefore turns to the substance of the claim.

It is undisputed that, if a breach under Article V of the contract were proven, Pfizer would be obliged to indemnify Stryker for such losses to the extent that they exceed $17.5 million, net of insurance.[115] However, the parties differ in their interpretation of how this applies to the situation at hand. Stryker argues that it has DUK-related claims against it in excess of $90 million and thus meets the $17.5 million threshold, even though it has not yet suffered damages in excess of that amount. In Stryker's view, once its contingent liability is greater than $17.5 million, it may obtain indemnification from Pfizer notwithstanding the fact that its actual losses are less than $17.5 million.[116]

Pfizer counters that a claim for indemnification accrues only when liability is incurred by way of actual payment. Consequently, Pfizer contends, it is liable only for damages as a result of breach of warranty, if proved, when and if Stryker actually incurs losses of more than $17.5 million, net of insurance.[117]

The interpretation urged by Stryker would be at odds with New York contract and indemnification law.[118] To assert a claim under a loss or liability indemnification agreement, a party must establish that the amount claimed is fixed. This may be established by proving that Stryker has paid the claims or, in the case of liability indemnity, "(1) by proof that a judgment has been obtained against [the party] or (2) by admission of liability ... and independent proof in the action against the indemnitors of the validity of the claims and the absence of any defense thereto."[119] Here, Stryker has not established that it is liable for the $90 million in claims, much less that the amount of liability is fixed.[120]

Pfizer's contention that Stryker may collect only once it has paid out claims in excess of $17.5 million, however, may assume too much as well. New York recognizes agreements that indemnify against loss and those that indemnify against liability.[121] Under an agreement to indemnify against loss, a claim does not accrue until the indemnified party has made a payment, or actually suffered a loss.[122] A

---

**115.** Def. Opp. Mem. 13; Pl. Reply 7.

**116.** Def. Opp. Mem. 13.

**117.** Pl. Reply 9.

**118.** *Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37 (1961).

**119.** *Maryland Casualty Co. v. Straubinger*, 19 A.D.2d 26, 29, 240 N.Y.S.2d 228, 231 (4th Dep't 1963); *see also* 755 Seventh Ave. Corp. v. Carroll, 266 N.Y. 157, 161, 194 N.E. 69 (1935) (summary judgment appropriate once amount was fixed by judgment of mechanics lien); *Trustees of the Village of Newburgh v. Galatian*, 4 Cow. 340 (N.Y.Sup.Ct.1825) (amount for liability indemnity must be "ascertained").

**120.** As of November 14, 2003, Stryker established that it had paid out settlements and

incurred legal fees with regard to the DUK litigation in the amount of $12,365,784.68. Silverstein Cert. II, Ex. 68, Augustine Cert. ¶ 3. Insofar as Stryker has expended or admitted liability to these amounts, they are fixed. Stryker has asserted also that, as of October 26, 2003, the remaining claims asserted by plaintiffs or individuals who have not yet filed lawsuits totals $76,400,000. Campillo Cert. ¶ 8. This amount is not fixed and, under New York law, Stryker does not have a cause of action for indemnity under a theory of loss or liability indemnity.

**121.** *755 Seventh Ave. Corp.*, 266 N.Y. at 161, 194 N.E. 69; *Aberdeen v. Blackmar*, 6 Hill 324 (N.Y.1844).

**122.** *McDermott v. New York*, 50 N.Y.2d 211, 217, 428 N.Y.S.2d 643, 646, 406 N.E.2d 460 (1980); *Varo, Inc. v. Alvis, P.L.C.*, 261 A.D.2d

right to indemnification against liability, however, arises when the party faces a fixed liability, even though it has not paid the claim and thus suffered no damage.[123]

 The Purchase Agreement allows indemnification for what it terms a "Loss" or "the Losses."[124] It defines "Losses" to include "all claims, actions, causes of action, judgments, awards, *liabilities*, losses, costs or damages ... claimed or arising directly from" one of the enumerated liabilities, including a breach of warranty or representation.[125] The Purchase Agreement provides also that these Losses shall be net of insurance or other collateral sources of reimbursement.[126]

Although loss indemnification is more common, courts have construed an indemnification agreement to be one against liability where there is some express indication that the parties so intended. In *United States Fidelity & Guaranty Co. v. Sequip Participacoes, S.A.*, the court interpreted the indemnification agreement as one for liability indemnity because it indemnified against "any and all liability for losses and/or expenses of whatsoever kind or nature (including, but limited to, interest, court costs, and counsel fees)" and expressly required indemnification "as soon as liability exists or is asserted."[127] Similarly, in *Goodridge v. Harvey Group, Inc.*, the court found that the agreement was one for liability where it indemnified

against "any claims, losses, liabilities and expenses."[128]

Here, Section 8.1 provides indemnification against Losses, but defines it to include liabilities, costs or damages. This definition, as Stryker suggests, is expansive and could suggest the parties intent to indemnify each other against any possible expense of litigation, including the payment of judgment. The requirement that the Losses be net of insurance, however, indicates that each party is required to actually suffer a loss, obtain insurance reimbursement if applicable and only then seek indemnification from the other party. This latter interpretation best accords with the parties' course of action. Stryker here has paid out at least $12 million in claims and has sought contribution from its insurer, thus treating the agreement as one for loss indemnification.[129]

Accordingly, Pfizer's motion for partial summary judgment dismissing count five of Stryker's counterclaim is granted to the extent it seeks indemnification for Losses that have not yet exceeded $17.5 million.

4. *Dismissing Stryker's Claims for Breach of the TSA*

a. *Indemnification*

 Count four of Stryker's counterclaim alleges that Pfizer breached its agreement to provide services under the

262, 265, 691 N.Y.S.2d 51, 55 (1st Dep't 1999).

123. *755 Seventh Ave. Corp.*, 266 N.Y. at 161, 194 N.E. 69; *see also United States Fidelity & Guar. Co. v. Sequip Participacoes, S.A.*, 98 Civ. 3099(THK), 2003 WL 22743430 (S.D.N.Y. Nov. 19, 2003).

124. Purchase Agreement § 8.1(a), at 126.

125. *Id.*(emphasis supplied).

126. *Id.* § 8.7, at 133–34.

127. *United States Fidelity & Guar.*, 2003 WL 22743430 *4; *see also MacArthur Bros. Co. v. Kerr*, 213 N.Y. 360, 365, 107 N.E. 572 (1915) (finding liability indemnity where agreement required indemnifying company to pay "before" the indemnified was compelled to pay the same).

128. *Goodridge v. Harvey Group, Inc.*, 778 F.Supp. 115, 133 (S.D.N.Y.1991).

129. *See* Silverstein Cert. II, Ex. 68, Augustine Cert. ¶ 4.

TSA "in a competent, businesslike manner."[130] Pfizer asserts that it is entitled to summary judgment dismissing this claim because Stryker waived all claims except those for gross negligence or fraud under the TSA by failing to give Pfizer written notice within thirty days of any service that is subject to the claim.[131]

Section 6.1 of the TSA provides that the receipt by Stryker or one of its affiliates of services

"shall be an unqualified acceptance of, and a waiver by [Stryker] and its Affiliates of their rights to urge any claim (other than one based on gross negligence or fraud) with respect to such services unless [Stryker] gives Pfizer written notice of a claim within thirty (30) days after performance by Pfizer or its Affiliates of the service which is the subject of the claim."[132]

Section 6.2 limits Pfizer's liability and provides that Stryker's "sole remedy" for breach of that agreement is the greater of a refund of the price of providing the service or the cost of Stryker to provide itself or hire a third party to do so.[133] Moreover, Section 11.8 provides that the rights under the TSA "shall be cumulative to and not exclusive of the rights and obligations of the parties contained in the Purchase Agreement."[134]

Stryker did not give the prescribed notice under the TSA. Rather, it argues that it is entitled to indemnification for losses sustained by virtue of the alleged breach of the TSA under Section 8.1(a)(iii) of the Purchase Agreement, which provides for indemnification for "any breach by the Seller Corporations of any of its covenants or agreements contained in this Agreement or in *any agreement.*"[135] Stryker therefore maintains that the TSA's notice and waiver provisions do not limit or preclude recovery for a violation of the TSA under Section 8.1(a)(iii).[136]

To be sure, the Purchase Agreement's provision for indemnification for breach of "any agreement" sweeps broadly and superficially includes the TSA. This interpretation, however, would have the effect of rendering the notice and waiver provisions of the TSA meaningless. Such an interpretation is not preferred if there is another construction that "gives a reasonable and effective meaning to all terms of a contract."[137]

Here, in addition to the TSA, other agreements were attached as exhibits to the Purchase Agreement, including a Transitional Intellectual Property License Agreement,[138] release agreements for individual and group terminations[139] and a collective bargaining agreement.[140] At the closing of the Purchase Agreement, the

130. Updike Aff., Ex. 1, Reid Decl., Ex. B, TSA § 6.1.

131. Pl. Mem. 29–30.

132. Updike Aff., Ex. 1, Reid Decl., Ex. B, TSA § 6.1.

133. *Id.* § 6.2

134. *Id.* § 11.8.

135. Purchase Agreement § 8.1(a)(iii), at 126 (emphasis supplied).

136. Def. Opp. Mem. 16–17.

137. *Galli v. Metz,* 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1019 (2d Cir. 1985)) (internal quotation marks omitted); accord *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37 (1961).

138. Purchase Agreement, Ex. D.

139. *Id.,* Exs. F–G.

140. *Id.,* Ex. H.

parties entered also into a joint defense and cooperation agreement, which does not itself contain any remedy or waiver provisions in the case of a party's breach.[141] Since there are agreements other than the TSA attached to the Purchase Agreement, an interpretation of Section 8.1(a)(iii) that does not allow indemnification for breach of the TSA would not render that section meaningless. Moreover, even if this interpretation narrows the meaning of "any" in Section 8.1(a)(iii), it better accords with the clearly expressed intent of the parties to limit Pfizer's liability under the TSA.[142] Stryker's alternative interpretation therefore fails. Summary judgment is granted dismissing count four of its counterclaim.

### b. Reckless and Grossly Negligent Performance

In count eleven of its counterclaim, Stryker asserts that it is entitled to indemnification for losses allegedly caused by Pfizer's reckless or grossly negligent performance of its services under the TSA.[143] Pfizer seeks summary judgment dismissing this count.[144]

■ A tort claim in favor of one contracting party arises from another party's negligent performance of its contractual obligations only if the potential consequences of the breach to members of the public are sufficiently catastrophic and threaten the public safety.[145] In *Sommer v. Federal Signal Corp.*, for example, the New York Court of Appeals held that a fire alarm company that negligently had deactivated a fire alarm only moments before a fire broke out in a commercial building was liable in tort as well as in contract because the injury that arose was an "abrupt, cataclysmic occurrence," which was typical of a tort claim.[146] Other courts have found tort claims to lie where a contracting party's negligence caused an electrical transformer to explode and leak oil containing PCBs into the plaintiff's building,[147] a large piece of concrete to fall in a heavily trafficked area,[148] extensive termite damage to the plaintiff's home,[149] and the possibility of serious health consequences from the inclusion of ingredients in vitamins which were not listed on the label and, in some cases, prohibited by law.[150]

■ Here, there is evidence from which a jury could conclude that the expired DUKs exposed recipients to serious health risks, including knee failure and the need for premature revision surgery,

**141.** Updike Aff., Ex. 3, Bernstein Decl., Ex. G, Joint Defense and Cooperation Agreement.

**142.** *See Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46, 150 N.Y.S.2d 171, 174, 133 N.E.2d 688 (1956) (specific provision controls where there is an inconsistency between a specific and a general contractual provision).

**143.** Am. Counterclaim ¶¶ 118–22.

**144.** Pl. Mem. 32.

**145.** *Pfizer v. Stryker*, 02 Civ. 8613(LAK), 2003 WL 21660339 *5 (S.D.N.Y. Jul 15, 2003).

**146.** 79 N.Y.2d 540, 552–53, 583 N.Y.S.2d 957, 961–62, 593 N.E.2d 1365 (1992).

**147.** *Syracuse Cablesystems, Inc. v. Niagara Mohawk Power Corp.*, 173 A.D.2d 138, 578 N.Y.S.2d 770 (4th Dep't 1991).

**148.** *Trustees of Columbia Univ. v. Gwathmey Siegel & Assocs. Architects*, 192 A.D.2d 151, 154, 601 N.Y.S.2d 116, 118 (1st Dep't 1993).

**149.** *Anunziatta v. Orkin Exterminating Co., Inc.*, 180 F.Supp.2d 353, 359 (N.D.N.Y.2001).

**150.** *Great Earth Int'l Franchising Corp. v. Milks Development*, 311 F.Supp.2d 419, 426 (S.D.N.Y.2004).

as well as the risks associated with that type of procedure.[151] That none of the individuals receiving the implants may have suffered catastrophic knee failure is immaterial, where, as here, there is a foreseeable risk of such a consequence.[152] The increased risk of having to undergo an invasive surgery earlier than necessary is sufficiently serious to give rise to an independent duty of care. Pfizer's motion for summary judgment dismissing this count therefore is denied.

### 5. *Dismissing Stryker's Fraud Claims*

Pfizer warranted and represented in Section 5.9(a) that it "[was] in compliance with all Laws applicable to the ownership or operation of its assets or the Business, except to the extent that the failure to comply therewith would not have a Material Adverse Effect."[153] Stryker asserts in counts eight and nine of its counterclaim that this representation was fraudulent because Pfizer knew that the DUKs were expired and thus that it was in violation of applicable FDA regulations.[154]

Pfizer seeks summary judgment dismissing these claims. It argues that Stryker explicitly waived all non-contractual claims and causes of action in the purchase agreement, thus foreclosing these fraud claims.[155] Moreover, it contends that Stryker's evidence of *scienter* is insufficient to create a genuine issue of fact.

#### a. *Limitation of Remedies*

Section 8.1 of the Purchase Agreement obliges Pfizer to defend and indemnify Stryker against losses arising from Retained Liabilities and, *inter alia*, any breach by Pfizer of any of its covenants, agreements, representations or warranties. Section 8.9 limits the remedies "with respect to the subject matter of this Agreement" to those provided in Section 8.1. It goes on to provide that "the parties hereby waive, to the fullest extent permitted by applicable law, any and all other rights, claims and causes of action (including rights of contribution, if any), known or unknown, foreseen or unforeseen, which may exist or may arise in the future."[156]

Pfizer contends that the waiver in Section 8.9 precludes Stryker from bringing this fraud claim or, at least, limits its remedies to whatever is obtainable under Section 8.1. Stryker rejoins that such a limitation is unenforceable as against public policy.

New York does not enforce agreements that purport to exonerate or limit a party's liability for willful or grossly negligent acts.[157] The limitation of remedies section does not exonerate Pfizer for fraud. It does, however, limit Stryker's remedy to actual, not consequential, damages. The question therefore becomes whether Stryker has raised a genuine issue of material fact as to whether Pfizer's conduct was fraudulent.

151. Silverstein Cert. II, Ex. 17, Jaffe Rep. ¶ 6; Ex. 19, Burstein Dep. 14–15; Updike Aff., Ex. 17, Jaffe Dep. 131, 133; Updike Reply Aff. Ex. 19, Engh Dep. 191–92.

152. *See Trustees of Columbia Univ.*, 192 A.D.2d at 154, 601 N.Y.S.2d at 118 ("[I]n this case, a potentially fatal disaster was averted only by sheer chance.").

153. Purchase Agreement § 5.9(a), at 59.

154. Am. Counterclaim ¶ 104.

155. Pl. Mem. 15.

156. Purchase Agreement § 8.9, at 135.

157. *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430, 438–39, 618 N.Y.S.2d 882, 886–87, 643 N.E.2d 504 (1994); *Kalisch–Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384–85, 461 N.Y.S.2d 746, 749–50, 448 N.E.2d 413 (1983).

### b. *Was Pfizer's Conduct Fraudulent?*

■ In order to recover damages for fraud under New York law a claimant must prove, by clear and convincing evidence, *inter alia* that the false representation relied upon was made recklessly or with knowledge of its falsity.[158]

Pfizer argues that there is no evidence that Pfizer, when it made its representation in Section 5.9(a), knew it was not in compliance with FDA regulations and that its lack of compliance would have a Material Adverse Effect.[159]

■ *Scienter* may be proved through circumstantial evidence by establishing facts showing a motive for committing fraud and a clear opportunity to do so.[160] Stryker first argues that a jury reasonably could find that Pfizer had an intent to defraud based on its financial interest in selling its prosthetics business, which Stryker asserts was declining, for a high price.[161] It next asserts that Pfizer's interest in selling the business as quickly as possible after Stryker's financing fell through and it negotiated a reduction in the purchase price from $1.9 billion to $1.6 billion gave Pfizer a reason to conceal any negative information.[162]

Although the financial motives Stryker points to suggest reasons for Pfizer to have concealed any negative information, they are typical of the general profit motivations of business persons. Such general allegations do not give rise to a strong inference of fraud.[163] This evidence of motive therefore does not raise a genuine issue of material fact that Pfizer "knew" that Howmedica was not in compliance with applicable regulations when it represented that it was in Section 5.9.

Stryker next asserts that a jury could infer *scienter* from Pfizer's actions in selling the product so close to the time at which it would be outdated. It claims that these actions show that Pfizer knew that it was not in compliance with FDA regulations. As discussed earlier, however, this evidence does not give rise to a strong inference of fraud or recklessness on the part of Howmedica personnel.

Finally, Stryker contends that a Pfizer response to a request to admit in this case gives rise to a strong inference of its fraudulent intent. Stryker submitted to Pfizer a request to admit that in or around May of 1993 to the closing date in 1998, it was the usual and ordinary course of business for Pfizer to be in compliance with applicable regulations. The response said that Pfizer " 'made every effort ... and went to great lengths to comply with appli-

---

**158.** *Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43, 57, 698 N.Y.S.2d 615, 621, 720 N.E.2d 892 (1999) (citing *Vermeer Owners v. Guterman,* 78 N.Y.2d 1114, 1116, 578 N.Y.S.2d 128, 130, 585 N.E.2d 377 (1991)); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 239 (2d Cir.1999).

**159.** Pl. Reply 12.

**160.** *See, e.g., Cofacredit,* 187 F.3d at 239; *Eastern Capital Corp. v. Freeman,* 10 Misc.2d 412, 417, 168 N.Y.S.2d 834, 839–40 (N.Y.Sup. Ct.1957), *aff'd,* 8 A.D.2d 782, 187 N.Y.S.2d 978 (1st Dep't 1959).

**161.** Silverstein Cert. II, Ex. 70, Simpson Cert. ¶¶ 6–8.

**162.** Def. Opp. Mem. 23; Def. 56.1 Counter–St. ¶¶ 187–88.

**163.** *Kalnit v. Eichler,* 264 F.3d 131, 139–40 (2d Cir.2001) (collecting cases rejecting inference of fraud from general profit motive in business context); *cf. Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000) (explaining that securities plaintiffs may not proceed on a fraud theory based on the motives held by all corporate insiders, including the desire to maintain a company's appearance of profitability).

cable regulations.' " [164] Stryker asserts that this statement is a contradiction of Pfizer's representation in Section 5.9 that it was "in compliance with all Laws applicable to the ownership or operation of its assets ... except to the extent that the failure to comply therewith would not have a Material Adverse Effect." [165] In essence, Stryker asserts that while Pfizer represented that it was in compliance with all laws in the Purchase Agreement, it now claims only that it made its best efforts.

This discrepancy does not give rise to an inference that Pfizer knew of the falsity of its representation when it assured Stryker of its compliance with the laws,[166] Indeed, Section 5.9 represented and warranted that Pfizer was in compliance with the law only to the extent that any lack of compliance would have a Material Adverse Effect on the business. So the response to the request to admit is not even contradictory. Consequently, summary judgment is granted dismissing counts eight and nine of Stryker's amended counterclaim.

### E. *Stryker's Motion*

Stryker here seeks summary judgment on count five of its amended counterclaim and dismissing Pfizer's amended complaint.

#### 1. *Dismissing the Amended Complaint*

The motion to dismiss Pfizer's amended complaint rests on the argument Stryker

made in opposition to Pfizer's declaratory judgment action; namely, that Pfizer is responsible for Losses arising from all DUKs, whether sold before, on or after the closing date as Retained Liabilities.[167] For the reasons given above, Stryker's motion is denied.

#### 2. *For Judgment on Count Five of the Counterclaim*

Stryker argues that Pfizer breached its warranty in Section 5.9 of the Purchase Agreement, which asserted that Pfizer "is in compliance with all Laws applicable to the ownership or operation of its assets or the Business, except to the extent that the failure to comply therewith would not have a Material Adverse Effect." [168] It argues that it is entitled to summary judgment because it has established (1) that Pfizer and its subsidiaries were not in compliance with all laws, and (2) that its losses exceed the $17.5 million threshold.[169]

Pfizer disputes Stryker's assertion on several grounds. It argues first that it was in compliance with all laws at the time of the closing. Next, it contends that even if it was not in compliance, Stryker misreads the Purchase Agreement. In its view, Stryker must establish both that Pfizer's failure to comply with all laws had a Material Adverse Effect and that it incurred losses in excess of $17.5 million to

---

164. Def. Mem. 21 (quoting Pfizer's Response to Stryker's and HOC's First Set of Requests for Admissions 4).

165. Purchase Agreement § 5.9(a), at 59.

166. Pfizer has produced evidence asserting that the negotiating team that authored the Purchase Agreement had no idea that the DUKs were being distributed more than five years after their manufacture. *See* Updike Aff., Ex. 3, Bernstein Decl. ¶ 11; Updike Aff., Ex. 1, Reid Decl. ¶ 19.

167. Corrected Memorandum of Law in Support of Defendants'/Counterclaimants' Motion for Summary Judgment ("Def. Mem.") 7–8.

168. Purchase Agreement § 5.9(a), at 59.

169. Def. Mem. 5. Stryker asserts also that Pfizer cannot now raise its failure to meet the $17.5 million threshold because it failed to deny it specifically and with particularity as required by Rule 9(c). That argument is addressed earlier and therefore the Court does not revisit it here.

obtain indemnification for any alleged breach.[170] Pfizer argues further that even if the breach was material Stryker cannot show that all of its losses from the DUKs were proximate consequences of this breach.

### a. Compliance With All Laws

It is undisputed that Howmedica's pre-closing shipment of 59 expired DUKs violated the FDA's Quality System Regulations ("QSR").[171] Pfizer argues, notwithstanding those shipments, that Howmedica and the other subsidiaries at issue were in compliance with the QSR at the closing.[172]

Parts 820.150 and 820.160 of Title 21 of the Code of Federal Regulations regulate the storage and distribution of medical devices. Part 820.150 requires each manufacturer to establish and maintain procedures "to ensure that no obsolete, rejected or deteriorated product is used or distributed."[173] Part 820.160 requires further that manufacturers develop procedures "to ensure that only those devices approved for release are distributed" and that "[w]here a device's fitness for use or quality deteriorates over time, the procedures shall ensure that expired devices or devices deteriorated beyond acceptable fitness for use are not distributed."[174] Pfizer's regulatory expert William Damaska opined that Howmedica was in compliance with these regulations on the closing date insofar as it had established and maintained a procedure and the poly filter system was validated and functioning.[175]

However, Part 820.160 does not require merely that a manufacturer establish and maintain a procedure. It mandates that those procedures ensure that no expired devices are distributed. Here, for whatever reason, Howmedica's procedures prior to December 4, 1998 did not ensure that expired devices were not distributed for implantation. Accordingly, at the very least, Howmedica was not in compliance with Part 820.160 at the time of the closing.

### b. Material Adverse Effect

Notwithstanding Pfizer's lack of compliance with the FDA regulation, its warranty in Section 5.9 is breached only if such failure to comply with applicable law would have a Material Adverse Effect. A Material Adverse Effect is defined in the Purchase Agreement as "an effect that is materially adverse to business results, operations or financial condition of the Business taken as a whole," excluding effects stemming from conditions in the economy as a whole or the medical device industry.[176] Pfizer asserts that its lack of compliance with the FDA regulation did not have a Material Adverse Effect on the business as a whole and therefore it did not breach Section 5.9.

Stryker disputes this interpretation, arguing that Section 8.1, which provides that any materiality standard "shall be disregarded" for the purpose of indemnification and replaced by a $17.5 million threshold, means that it does not have to establish that the breach had a materially adverse effect but rather that its Losses exceed

**170.** Plaintiff's Memorandum of Law in Opposition to Counterclaimant's Motion for Summary Judgment ("Pl. Opp. Mem.") 5–6.

**171.** Silverstein Cert., Oct. 27, 2003 ("Silverstein Cert."), Ex. 4, Johnson Rep. ¶ 7; Ex. 5, Damaska Rep. 4.

**172.** Pl. Opp. Mem. 7–9; Pfizer's Response to Stryker's Rule 56.1 St. ("Pl. 56.1 Counter St.") ¶ 33.

**173.** 21 C.F.R. § 820.150(a).

**174.** Id. § 820.160(a).

**175.** Silverstein Cert., Ex. 5, Damaska Rep. 2.

**176.** Purchase Agreement § 1.1, at 17.

$17.5 million.[177] But this interpretation is not supported by the plain language of the Agreement.

Section 8.1 states that "for purposes of this Article VIII, all materiality exceptions and qualifications set forth in any representation and warranty of Pfizer contained in this agreement shall be disregarded." [178] The "shall disregard" language refers to Article VIII and therefore does not alter or negate the qualification in Section 5.9(a) that Pfizer was in compliance with all laws to the extent that noncompliance would not have a Material Adverse Effect.

Pfizer's interpretation best accords with the structure of the Agreement as well. The Material Adverse Effect qualifier limits only the representation in Section 5.9 with regard to compliance with all laws. The materiality provision of Section 8.1, however, applies to all breaches of the warranties in Article V. Accordingly, Stryker must first establish that Pfizer's lack of compliance had a Material Adverse Effect in order to prove breach of warranty.

Pfizer claims that it was in substantial compliance with all laws at the time of the closing and that its pre-closing shipment of 59 outdated DUKs did not have an adverse effect on the business, as evidenced by the fact that the FDA did not cite either Howmedica or HOC for its shipment of the DUKs.[179] Moreover, it asserts that as it is responsible for the liability for these pre-closing DUKs, the business has not suffered any Material Adverse Effect.

Stryker counters that had Pfizer been in compliance with the QSR prior to the closing, none of the outdated DUKs would have been shipped, pre- or post-closing. It contends that Pfizer's noncompliance therefore must be measured by the total amount in liability Stryker faces from the DUK litigation, which it claims exceeds $76 million.[180] This amount, in Stryker's view, establishes that Pfizer's noncompliance had a Material Adverse Effect.

 Assuming *arguendo* that Stryker has suffered losses from the DUKs in the amount it claims, Pfizer contends that there is a genuine issue whether its noncompliance was the proximate cause of Stryker's alleged losses. It asserts that Stryker's own negligent conduct was a superseding cause of, or a substantial contributor to, its losses from the post-closing DUKs. Pfizer points to evidence that Stryker had actual knowledge that not all of the products transferred to it as part of the sale were merchantable [181] and, as early as November of 1999, of adverse events caused by the DUKs yet continued to distribute them.[182] Pfizer argues also that the Purchase Agreement's waiver of all warranties of merchantability and fitness gave Stryker constructive notice that it had to inspect each product to ensure its fitness prior to sale.[183] In all the circumstances, Pfizer has raised a genuine issue of fact whether all of Stryker's losses are attributable to its alleged breach of Section 5.9. Consequently, summary judgment on this count is denied.

177. Def. Reply 8–9.

178. Purchase Agreement § 8.1(a)(iv), at 127.

179. Pl. Opp. Mem. 7–9.

180. Def. Mem. 6. As of November 2003, Stryker has only payed out claims and incurred litigation expenses of approximately $12 million. *See* Silverstein Cert. II, Ex. 68, Augustine Cert. ¶ 3.

181. Pl. Opp. Mem. at 12; Updike Aff. 11/14/03 ("Updike Aff. II"), Ex. 7, Bryant Rep.

182. Pl. Opp. Mem. at 13–14; Updike Aff. II, Ex. 4, Damaska Rep. at 9.

183. *See* Purchase Agreement § 6.8, at 75.

## IV

For the foregoing reasons, Pfizer's motion for summary judgment [DI 91] is granted to the following extent:

1. It is hereby declared that Stryker shall indemnify, defend and hold Pfizer harmless for all Losses, as defined in the Purchase Agreement, other than punitive damages from third party claims relating to DUKs sold after December 4, 1998, and reimburse Pfizer for its reasonable attorney's fees in connection with the instant declaratory judgment action.

2. Stryker is liable to Pfizer on count two of Pfizer's Amended Complaint [DI 44], breach of contract, for an amount to be ascertained at trial.

3. Count four of Stryker's Amended Counterclaim [DI 46] is dismissed.

4. Count five of Stryker's Amended Counterclaim [DI 46], to the extent that it seeks indemnification for Losses as a result of any breach of warranty which, in the aggregate, amount to less than $17.5 million, is dismissed.

5. Counts six and seven of Stryker's Amended Counterclaim [DI 46], to the extent that they seek indemnification for Losses resulting from DUKs sold after December 4, 1998, are dismissed.

6. Counts eight and nine of Stryker's Amended Counterclaim [DI 46] are dismissed.

The motion is denied in all other respects.

Stryker's motion for summary judgment [DI 94] is denied in all respects.

SO ORDERED.